**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

STEPHANIE LUNDQUIST-ARORA,

    *Plaintiff*,

v.

    Case No. ___

FAIRFAX COUNTY SCHOOL BOARD;
and DR. MICHELLE C. REID, in her official
capacity as Superintendent of Fairfax County
Public Schools,

    *Defendants*.

## COMPLAINT

Plaintiff Stephanie Lundquist-Arora brings this Complaint under the First and Fourteenth Amendment, *see* 42 U.S.C. §1983, and Article I, Sections 11 and 16 of the Virginia Constitution, against the Fairfax County School Board ("School Board"), the governing body of Fairfax County Public Schools ("FCPS"), and Dr. Michelle C. Reid, the Superintendent of FCPS, and alleges as follows:

### INTRODUCTION

1. Parents have the right to "direct 'the religious upbringing' of their children." *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 486 (2020). "The practice of educating one's children in one's religious beliefs, like all religious acts and practices, receives a generous measure of protection" under the Free Exercise Clause. *Mahmoud v. Taylor*, 606 U.S. 522, 547 (2025).

2. Parents also have "primary authority with respect to 'the upbringing and education of children." *Mirabelli v. Bonta*, 607 U.S. 492, 497 (2026).

1

3. Policies that provide for the "unconsented facilitation of a child's gender transition" and that "shut out" parents from "participation in decisions regarding their children's mental health" violate parents' free exercise rights under the First Amendment and the right to direct the upbringing of their children under the Fourteenth Amendment. *Mirabelli*, 607 U.S. at 496-97.

4. Such policies also violate Virginia's Free Exercise and Due Process Clauses. Va. Const. art. I §§11, 16.

5. FCPS regulations flout both fundamental rights. Regulation 2603 mandates that school officials facilitate the social transition of students who identify as "gender-expansive or transgender" through a host of "accommodations." The policy requires use of the student's "chosen name and pronouns" at school and on certain "school documents such as yearbooks and communications to outside media." And it requires schools to allow students to use intimate facilities and participate in gendered activities in accordance with their gender identity.

6. Regulation 2603 does all of this without requiring parental consent, and even without requiring parental notification. It provides no way for parents to opt out or prevent the school from applying the policy to their children.

7. Plaintiff is the parent of three children who attend schools in the FCPS system. She objects to these policies, and she does not want her children subjected to them. Plaintiff wants to educate her children according to her religious beliefs that God creates each person as male or female, that complementary sexes reflect the image of God, and that sex cannot be altered. And Plaintiff wants to control how decisions are made for her children concerning these fundamentally important issues. Under the Regulation, however, parents are deprived of any meaningful ability to direct or influence how FCPS responds to and manages their child's mental health and medical

issues, including decisions concerning social transition and the manner in which school personnel address and treat the child at school.

8. Despite the Defendants receiving notice of this constitutional infirmity and demand letters from Plaintiff to rescind or reform their policies, they have refused to cure these constitutional violations.

9. The Regulation should be declared unconstitutional, and Defendants should be enjoined from enforcing it.

## PARTIES

10. Plaintiff is and was, at all times mentioned herein, a resident of Fairfax County, Virginia, and the parent of three children currently enrolled at FCPS schools. Plaintiff's oldest son just finished his junior year, and her middle son finished freshman year in an FCPS high school. Her youngest son completed the seventh grade at an FCPS middle school. Her children will continue to attend FCPS schools for the next school year, where they will be a senior, a sophomore, and an eighth grader.

11. The School Board is the public body that governs FCPS and is located in Fairfax County, Virginia.

12. Dr. Michelle C. Reid is and was, at all times mentioned herein, the Superintendent of FCPS acting under color of state law. Defendant Reid is responsible for adopting and implementing FCPS policies and practices, including the challenged policies and practices set forth in this Complaint. Defendant Reid is sued in her official capacity only.

**JURISDICTION AND VENUE**

13. The Court has subject-matter jurisdiction over the federal constitutional claims pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a)(3) (deprivation of a federal right).

14. The Court has subject-matter jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction) because these claims are sufficiently related to the federal claims in this action such that they form part of the same case or controversy.

15. This Court has the authority to award damages pursuant to 28 U.S.C. § 1343, as well as costs and attorneys' fees under 42 U.S.C. § 1988.

16. Venue is proper in this Court because the acts supporting this Complaint took place in this district and because Defendants have their principal place of business in this district.

**FACTS**

**I. The Shifting Medical Landscape on Gender Dysphoria**

17. There is an ongoing debate in the United States over sex, gender, and how to care for individuals, specifically children, who suffer from gender dysphoria.

18. One often discussed intervention for gender dysphoria is "social transition," which can include using a new, preferred name or pronouns, adopting different clothing and grooming habits, and using facilities and participating in activities according to a new identified gender.

19. Social transition is "'one of the most difficult psychological changes a person can experience.'" *Mirabelli v. Olson*, 691 F. Supp. 3d 1197, 1208 (S.D. Cal. 2023) (quoting testimony of Dr. Erica Anderson). It also makes children more likely to pursue increasingly invasive "treatments," like cross-sex hormones, puberty blockers, and surgeries down the line. *See* Benjamin de Mayo et al., *Stability and Change in Gender Identity and Sexual Orientation Across Childhood and Adolescence*, 90 Monographs Soc'y for Research in Child Dev. 7, 14, 39-40 (2025),

bit.ly/45kQTC2, (finding that the majority of a group of study participants who had socially transitioned before the study moved on to puberty blockers and cross-sex hormones).

20. Despite assertions to the contrary, "there is no medical consensus on how best to treat gender dysphoria in children." *United States v. Skrmetti*, 605 U.S. 495, 530 (2025) (Thomas, J., concurring).

21. Gender dysphoria treatments "are subject to a rapidly evolving debate that demonstrates a lack of medical consensus over their risks and benefits." *Id.* at 532 (Thomas, J., concurring). This shifting medical landscape underscores continuing uncertainty about the efficacy of "gender-affirming" care. Indeed, major scientific associations have recently flipped their positions and come out against certain interventions for children under eighteen. *See* Andrew Jacobs, *Doctors' Group Endorses Restrictions on Gender-Related Surgery for Minors*, N.Y. Times (Feb. 4, 2026), archive.ph/r0VXk (noting the American Society of Plastic Surgeons and American Medical Association endorse age limits on gender-related surgery). According to one review, "[g]iven the weakness of the research" on the effectiveness of social transition, it is "unclear whether it alters the trajectory of gender development, and what short- and longer-term impact [it] may have on mental health." Cass, *Independent Review of Gender Identity Services for Children and Young People: Final Report*, at 163 (Apr. 2024), perma.cc/7XEL-UP2A.

22. Parents too, have different views on the best way to help and support a child who suffers with gender confusion.

## II. Schools Across the Country Override Parents on Gender-Identity Decisions

23. "[T]he interest of parents in the care, custody, and control of their children[] is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality). A child is "not the mere creature of the state," *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925), and

5

the "right[] … to raise one's children ha[s] been deemed 'essential'" and one of the "'basic civil rights of man,'" *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). These parental rights are rooted in the "historica[l] … recogni[tion] that natural bonds of affection lead parents to act in the best interests of their children." *Parham v. J. R.*, 442 U.S. 584, 602 (1979) (citing 1 W. Blackstone, Commentaries, 447; 2 J. Kent, Commentaries on American Law, 190).

24. Thus, it is long established that "parents—not the State—have primary authority with respect to 'the upbringing and education of children.'" *Mirabelli*, 607 U.S. at 497. This right "presumptively includes counseling [children] on important decisions." *H.L. v. Matheson*, 450 U.S. 398, 410 (1981). The right "to decide what is best for the child" means that parents "can and must make … judgments" in areas like children's "need for medical care or treatment." *Parham*, 442 U.S. at 603-04; *Mirabelli*, 607 U.S. at 497. It is also particularly strong in circumstances involving "fundamental values" and "intimate decision[s]." *Arnold v. Bd. of Educ. of Escambia Cnty.*, 880 F.2d 305, 313 (11th Cir. 1989) (parents' rights protect "the opportunity to counter influences on the child the parents find inimical to their religious beliefs or the values they wish instilled in their children").

25. And parental rights extend to decisions made for their children at school. "Parents do not implicitly relinquish all [their parental rights] when they send their children to a public school." *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 202 (2021) (Alito, J., concurring); *see also Pierce,* 268 U.S. at 535; *Meyer v. Nebraska*, 262 U.S. 390, 401 (1923).

26. Parents have "the right not to be shut out of participation in decisions regarding their children's mental health," including "gender dysphoria." *Mirabelli*, 607 U.S. at 497. This is because a child's gender identity implicates the most fundamental issues concerning the child, including religion, medical care, sense of self, and mental and emotional well-being. It's also a

medical condition that significantly impacts a child's mental health. *See id.*; *Skrmetti*, 605 U.S. at 502. This is an area where parents' roles are key because children "simply are not able to make sound judgments." *Parham*, 442 U.S. at 603.

27. Parents also have the right to direct the religious upbringing of their children. "At its heart, the Free Exercise Clause of the First Amendment protects 'the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of' religious acts," including "[t]he practice of educating one's children in one's religious beliefs." *Mahmoud*, 606 U.S. at 546-47.

28. The right "extends" beyond one's own home, to "the choices that parents wish to make for their children outside the home," including in public schools. *Id*. Parents have the right to opt out of school policies that place their children "in an environment hostile to [their] beliefs." *Wisconsin v. Yoder*, 406 U.S. 205, 211 (1972). Policies that "substantially interfere with the religious development" of children must satisfy strict scrutiny. *Mahmoud*, 606 U.S. at 565 (cleaned up).

29. Policies that require the "unconsented facilitation of a child's gender transition" and "permit the disclosure of a student's gender transition at school only if the student consent[s]" violate parents' free exercise rights. *Mirabelli*, 607 U.S. at 493, 496.

30. Schools across the country have adopted policies that flout both parental rights and free exercise rights. *See List of School District Transgender – Gender Nonconforming Student Policies*, Defending Educ. (updated May 4, 2026), perma.cc/CWZ5-Z6RS. Under these policies, schools encourage and support students' transitioning to a new gender without parental knowledge or consent. Often, the policies encourage schools to affirmatively hide their actions from parents.

31. These policies are not just unconstitutional; they are wreaking havoc on children across the country. In some cases, parents only learn about years-long efforts by schools to socially transition their children after the child has been the victim of bullying or suffered a mental health emergency like attempted suicide. And in every case, these policies drive a wedge between children and their parents.

32. In *Mirabelli*, for example, one California school hid a child's social transition from parents for over a year. *See Mirabelli*, 607 U.S. at 493-94. The parents only learned about it after the child attempted suicide and was hospitalized involuntarily because she was at risk for self-harm. *Id*. Even then, the school continued using the child's preferred name and pronouns, despite her parents' objections. *Id*.

33. Another California school affirmatively hid a students' transition from his parents, despite the parents' "proactive involvement" in the students' life, and the fact that the parents had voiced their concerns that his diagnosed depression and potential autism made him "particularly vulnerable to social contagion related to gender identity." Kathianne Boniello, *California couple sues LA schools for trans 'secrecy policy' after teen's suicide: 'Social contagion*,' N.Y. Post (Mar. 14, 2026), perma.cc/VJP3-MD4T. Instead of allowing the parents, who were "not transphobic," but "kn[e]w [their] son better than anyone" and were "worr[ied] about his mental health," the school ignored their messages and praised his transition. *Id*. This "destroyed" the family, making the student "withdrawn, oppositional, and distrustful" of his parents, and he eventually committed suicide. *Id*.

34. A school district in Ohio called a student by her given name and female pronouns anytime her parents were around but used a male name and pronouns behind their back. *Kaltenbach v. Hilliard City Schs.*, 2025 WL 1147577, at *1-2 (6th Cir. Mar. 27) (Thapar, J.,

concurring). The parent only found out when the school accidentally mailed the student a postcard using the male name. *Id*. Their daughter, too, attempted suicide. *Id*.

35. In Michigan, a middle school secretly began referring to a female student using a male name and pronouns. Jennifer Mead, *Opinion: School socially transitioned our daughter and didn't tell us*, Detroit News (Sept. 10, 2025). This was despite the fact that the student's parents had been in regular contact with the school counselor and worked closely with her to address their daughter's diagnosed autism and mental health struggles. *Id*.

36. The list of cases goes on. *See, e.g.*, Katie Baker, *When Students Change Gender Identity, and Parents Don't Know*, N.Y. Times (June 26, 2024), archive.ph/ggRFi. Over and over, parents are being left in the dark when it comes to crucial decisions about their children. Parental exclusion policies take parents—the ones who have the most comprehensive understanding of their own children—out of the equation and substitute the state as the decisionmaker. And when parents are kept in the dark, they can't provide the emotional support or secure the medical care that their children need. *See Kaltenbach*, 2025 WL 1147577, at *2 (Thapar, J., concurring) (schools, through "deception," "stri[p] them of that possibility").

## III. FCPS Policies Facilitate Social Transition without Consent

### A. FCPS Implements Regulation 2603 to Facilitate Student Gender Transitions Without Parental Knowledge or Consent

37. The School Board has final policymaking and decision-making authority over rules, regulations, and decisions governing FCPS personnel.

38. In coordination with the School Board, the FCPS Superintendent provides leadership and establishes strategic direction for the school division.

39. One of the FCPS Superintendent's core responsibilities is to implement School Board policies, including through the enactment of regulations.

40. The School Board retains discretionary authority to review and revise regulations.

41. On October 9, 2020, pursuant to Policy 1450, FCPS's non-discrimination policy, FCPS adopted the first iteration of Regulation 2603, entitled "Gender-Expansive and Transgender Students." This regulation was superseded by Regulation 2603.2, which took effect on April 21, 2022.

42. FCPS's actions under Regulation 2603.2 show that their goal is to facilitate children's gender transitions without parental knowledge or consent.

43. This is revealed in testimony from prior FCPS officials. For example, Bethany Demers, an FCPS representative from the Office of Intervention and Prevention Services, testified under oath that under Regulation 2603.2, "[s]chools shall accept a student's or parent's or guardian's assertion of a student's gender expansive or transgender status," and that FCPS determined whether a student is transgender or gender expansive based solely on "the student's *or* parent's assertion that they are transgender." (emphasis added).

44. Ms. Demers testified that there was no required form for students to change their pronouns at school: "There's not any kind of required form that would be used by the school division." She confirmed that "the student doesn't need to do more than ask" to be referred to by different pronouns.

45. Ms. Demers also confirmed under oath that parental participation in a student's social transition was not required under Regulation 2603.2.

46. Ms. Demers testified that a student did not need to inform staff before using a restroom corresponding to their chosen gender identity: "They don't need to inform and when we are made aware, we would have that conversation with that student." She confirmed that "the school is not required to notify parents just for using the restroom."

47.     Michael Axler, FCPS's Director of Intervention and Prevention Services, similarly testified that under Regulation 2603.2, "students are able to assert their gender identity and are able to request that they be called by chosen name and pronouns and use facilities that correspond with their gender identity with or without their parents providing permission."

48.     Mr. Axler further confirmed that when a parent objected to a student's transgender status being acknowledged at school, the school "wouldn't rescind the student's ability to be referred to by their chosen name or pronoun or access facilities that correspond to the gender identity based on parental [preference]."

49.     Mr. Axler testified that "[w]e don't require students to obtain permission to use restrooms" corresponding to their chosen gender identity.

50.     Penny Gros, a former Assistant Superintendent for FCPS, confirmed under oath that a training slide used by FCPS stated: "Students can change their name and gender without permission of legal documentation."

51.     Ms. Gros further testified that she imagined "there are students that ask to be called something and no one is calling home to say, 'Hey, by the way, today your child asked me to call them something different.'"

52.     Ms. Gros confirmed that "if a male identified as a female, they could then use the female locker room."

53.     Ms. Gros confirmed that under Regulation 2603, a transgender student "can't be forced to use a single use restroom, but it can be offered as an option just as [we] offer to any student who wants to use a single use restroom."

54.     Michael Mukai, former Principal of West Springfield High School, an FCPS school, confirmed that a student would not need documentation to use a bathroom inconsistent

with their biological sex, explaining: "we're not monitoring. There's no paperwork or specific IDs or anything that we specifically—we don't card kids that go into bathrooms."

55. In addition to this testimony, FCPS issued a guidance document that accompanied Regulation 2603.2, as a "tool" expanding on the policy. Though the guidance document has since been revoked, it provides helpful background to FCPS's policy, showing officials' goal was to facilitate transitions without parental input. The guidance document said schools "shall not disclose confidential information related to the student's transition with the parents or guardians" if the student had not yet shared that information with their parents. It explained that "[s]tudents may choose to have their parents participate in [the transitioning] process; however, parental participation is not required."

56. Per the guidance document, notifying parents is "[g]enerally … unnecessary," and before parents or guardians could be notified about a student's transition, "school staff should work closely with the student to assess the degree to which, if any, the parent or guardian will be involved in the process and must consider the health, wellbeing, and safety of the transitioning student."

57. The guidance document also established procedures to affirmatively hide gender-identity related information from parents by creating parallel record systems so that parents wouldn't be made aware of changes to their child's name and information by reading it in student records. "If a student transitioning at school is not ready to share with their family about their transgender status, this should be respected. In this scenario, school staff should make a change socially, calling the student by the chosen name, while their official SIS information remains the same." It also encouraged using a child's legal name when talking to parents and not keeping

written records that would be subject to disclosure under the Family Educational Rights and Privacy Act.

58. Ms. Demers confirmed that under the policy: "If a student transitioning at school is not ready to share with their family about their transgender status, this should be respected."

59. Ms. Demers admitted to writing an email stating that the guidance document's written support plan is optional to avoid "outing" students to their parents. The email states: "The biggest reason this is optional is that it may unintentionally out the student to the parents. For example, if the student is not out to their parent and the parent conducted a FERPA request, this would need to be included which would then out the student."

60. Mr. Axler explained the rationale for not requiring parental notification: "The reason it is not required is there are certain circumstances where a student has not disclosed their transgender identity to their parents and this note, situations where students have noted that they would be at risk of harm if their parents were made aware."

61. Mr. Axler confirmed: "It is not required to include the parents [when a student expresses their transgender or gender-expansive status], but it is strongly encouraged."

62. Ms. Gros described that parent notification was handled on a "case-by-case basis" and that she, as an assistant superintendent, would "generally . . . not by myself give guidance on regulations that are complex like this one" and would instead refer principals to the Office of Intervention and Prevention Services.

63. Ms. Gros confirmed that a parent once complained in writing: "Why is my daughter being called by another name in school that's not on her birth certificate," "[m]y wife and I never gave the school authority to do so," and, "[m]y religion forbids this and I will not accept it."

64. Principal Mukai testified that he once sought guidance from then-Assistant Superintendent Ms. Gros because a parent was "concerned that if their child chose—changed their gender pronouns that . . . the faculty and staff wouldn't inform the parent." Despite his inquiries, Principal Mukai testified that he "actually d[idn't] know" whether schools are required to inform parents when a student changes gender pronouns.

**B.      AFL's Demand and FCPS's Failure to Act**

65. On April 28, 2026, Plaintiff, by and through her legal counsel, America First Legal Foundation ("AFL"), sent a letter to FCPS Superintendent Dr. Michelle C. Reid identifying the constitutional and statutory deficiencies in Regulation 2603 and its guidance document. Specifically, Plaintiff asserted that FCPS's policies violated the Free Exercise Clause, the Due Process Clause, and FERPA.

66. The letter emphasized that in *Mirabelli v. Bonta*, the U.S. Supreme Court held that school policies facilitating a student's social gender transition without parental knowledge or consent likely violate both the Free Exercise and Due Process Clauses, as they "cut out the primary protectors of children's best interests: their parents" and are not narrowly tailored to a compelling interest. 607 U.S. at 496-97. Plaintiff's letter explained that FCPS Regulation 2603 and its guidance document are even more constitutionally deficient than the policies at issue in *Mirabelli* because they affirmatively require staff to facilitate social transitions, conceal transition-related information from parents, and deny parents any notice, consent, or opportunity for exemption.

67. To avoid litigation, Plaintiff requested that, no later than May 18, 2026, FCPS either: (1) rescind Regulation 2603 and the guidance document in their entirety, or at a minimum immediately suspend their enforcement pending revision to ensure compliance with federal law and the Constitution; or (2) adopt and publish a clear, accessible process by which parents may

obtain timely notice, full access to all education records, and a meaningful exemption or opt-out from any policy or practice that (a) facilitates or affirms a student's gender transition at school, or (b) withholds information from parents regarding such matters.

68. Plaintiff further demanded that FCPS immediately preserve all documents and electronically stored information potentially relevant to these claims.

69. FCPS failed to rescind, suspend, or reform its policies, and failed to establish a meaningful exemption or opt-out process by the May 18, 2026, deadline. Instead, FCPS rescinded the guidance document and made minimal changes to Regulation 2603. Those changes, reflected in Regulation 2603.3, did not address Plaintiff's concerns. The core of 2603 remained unchanged, including the requirement that schools facilitate social transitions without parental consent, the lack of notice to parents before facilitating social transitions, and the inability of parents to opt out of the Regulation.

70. Plaintiff replied to FCPS, noting the continuing constitutional deficiencies in Regulation 2603.3, and asking for clarification as to how the revised Regulation would apply in practice. FCPS responded to that letter on June 12, 2026, asserting that its policy was not unconstitutional. Regulation 2603.3 will take effect on July 1, 2026.

71. Upon information and belief, FCPS's policies remain in full force and effect and continue to infringe upon Plaintiff's constitutional rights as a parent of children enrolled in FCPS.

**C.     FCPS Regulation 2603.3**

72. According to Regulation 2603.3, its purpose is "[t]o establish procedures and guidelines for schools to ensure that all students, including gender-expansive and transgender students experience a safe, supportive, and inclusive school environment."

73.    For example, the Regulation lays out a "support team" framework for "provid[ing] the gender-expansive or transgender student with safe and equitable access to all school and school division facilities and activities." The support team creates a "support plan" to help facilitate any "accommodations" the student might need, including "check-ins" with counselors, information about community resources, plans to "inform appropriate teachers, coaches and other personnel of the student's chosen name/pronouns," and potential training for staff on gender diversity.

74.    Regulation 2603.3 mandates the use of a student's chosen name and pronouns at school, "regardless of the name and gender recorded in the student's permanent pupil record," without requiring parental permission. Students' chosen names and gender markers will also be used in "school documents such as yearbooks and communications to outside media."

75.    Regulation 2603.3 permits access to sex-segregated facilities, including locker rooms and restrooms, consistent with a student's chosen gender identity and without parental involvement.

76.    If a school-sponsored event involves overnight housing, "students may be assigned to a room consistent with the student's gender identity."

77.    Gender-expansive or transgender-identifying students cannot be required to use facilities that conflict with their chosen gender identity, nor can they be limited to using only private, single-occupancy, or other separate accommodations.

78.    Regulation 2603.3 permits gender-expansive or transgender-identifying students to enroll in gender specific courses and participate in gender specific units that correspond to their chosen gender identity without parental permission or notification.

79.     Under Regulation 2603.3, FCPS does not require parental notification or consent before permitting students to be referred to by chosen names and pronouns that do not match their biological sex.

80.     Under Regulation 2603.3, FCPS does not require parental notification or consent before allowing students to use a common restroom or locker room that does not match their biological sex.

81.     Under Regulation 2603.3, FCPS does not require parental notification or consent before allowing students to participate in gendered classes, activities, or programs that do not match their biological sex.

82.     Under Regulation 2603.3, FCPS does not allow parents to opt out of the regulation.

83.     Regulation 2603.3's support team framework includes parents as part of the support team, but only if one is convened. Under the regulation, the school will only "convene a support team" if a "student or parent" requests one. But until the support team exists, the school is under no obligation to notify parents that their child is struggling with their gender, even while they *are* under an obligation to facilitate the student's social transition in the ways outlined above.

84.     In addition, even when a support team is convened, it contemplates the parent as just one member on a "multidisciplinary team." It does not give the parent authority to overrule support plans implemented by the rest of the team, or even to opt out of having a support team altogether.

## IV.     The Effect of Regulation 2603.3 on Plaintiff

85.     Plaintiff lives within the boundaries of the school district known as Fairfax County Public Schools and is the parent of three school-aged children.

86.     Plaintiff's three sons are enrolled in two different Fairfax County Public Schools. Her oldest son finished his junior year and will be a senior next year in an FCPS high school. Her middle son finished his freshman year and will be a sophomore next year in that same school. Her youngest just finished seventh grade and will begin the eighth grade next year at an FCPS middle school.

87.     Plaintiff is a practicing Christian and regularly attends church with her children. She has consistently raised her children in her Christian faith.

88.     Plaintiff believes God made man and woman in his image and that complementary sexes reflect the image of God. She believes based on Scripture and Christian teachings that there are only two sex presentations, which are male and female. She believes that it is impossible to change sex and that sex was given to us by God for a reason. She does not believe gender is a coherent category separate from sex. These beliefs govern Plaintiff's views on human nature, marriage, gender, sexuality, morality, politics, ethics, natural law, and social issues.

89.     Plaintiff believes that rejection of one's biological sex is a rejection of the image of God within that person. She believes that to acknowledge or endorse that sex is altered is to speak against God and her beliefs. She believes that referring to another person using pronouns that do not correspond with biological sex is harmful to that person because it is false.

90.     Plaintiff acknowledges that gender dysphoria exists, but she believes that is historically a rare condition. She believes there is a difference between gender dysphoria and a child's confusion about their gender, which can lead a child to adopt a different name, pronouns, clothing, and so forth. Plaintiff also believes that confusion about gender can be a part of adolescence and that it does not always persist beyond adolescence. She does not believe her children can be "gender-expansive" or "transgender."

91. Plaintiff knows that her children, like all children, may at some point during adolescence be susceptible to the influence of gender ideology, and she wants to be the one guiding them through that confusion.

92. Plaintiff believes that issues of gender are sensitive issues that should be left to families to discuss and resolve, not to schools. These views stem from her sincerely held religious beliefs.

93. Plaintiff believes she has a duty to raise her children in her religious tradition and teach them her religious beliefs.

94. Plaintiff also strongly believes that parents have the right to direct the upbringing of their children.

95. Plaintiff is opposed to FCPS's acceptance, encouragement, and facilitation of students self-selecting genders and pronouns. Plaintiff believes that to acknowledge or endorse that sex can be altered is to speak against God and her sincerely held religious and philosophical beliefs. Plaintiff does not support Defendants' adoption or enforcement of Regulation 2603, and she strongly objects to any attempt to apply the regulation to her or her children.

96. Regulation 2603 is antithetical to the religious pillars and teachings of Plaintiff's Christian faith. Regulation 2603 endorses worldviews that directly conflict with her beliefs, including the alleged fluidity of sex and gender and a person's ability to self-select such identities.

97. Plaintiff wants to be informed if the school is assisting her children with a social transition. She wants to receive this information without her child being the one to first tell her and before the school takes any action to facilitate a social transition. But Regulation 2603.3 requires schools to facilitate a transition regardless of whether Plaintiff knows or approves.

98.     Plaintiff also want to exercise her fundamental right as a parent to guide her sons' upbringing and to help them navigate any issues that might arise regarding their perceptions of their gender identity.

99.     And Plaintiff wants to exercise her right to raise her children in accordance with her religious beliefs, including by educating them in those beliefs.

100.    Plaintiff does not want her children to be subject to the policies outlined in Regulation 2603.3. Specifically, she does not want her children to be called by names and pronouns that do not align with their biological sex, and she does not want them to use intimate spaces or participate in activities according to their supposed "gender identity." Plaintiff does not want to participate in a "gender-expansive and transgender" student "support team" for her children. She believes doing these things would be lying to her children and would go against her religious beliefs.

101.    Under Fairfax County Public School's gender transition policy as described in Regulation 2603.3, however, Plaintiff knows that when gender issues arise, her role will be displaced by FCPS administrators who do not know her children as well as she does.

102.    Plaintiff knows that the policy requires school officials to immediately accept and validate a child's expression of gender identity—regardless of their age—without questioning how the child arrived at that conclusion. It requires them to allow children to go by "chosen names and pronouns"; (2) use opposite-gender restrooms and locker rooms; (3) bunk in rooms that align with their gender identity on overnight trips; (4) participate in intramural sports, clubs, activities, and classes based on their preferred gender.

103.    Plaintiff objects to Regulation 2603.3 because it permits and/or facilitates a student's gender transition at school without parental knowledge or consent. This policy prevents

Plaintiff from knowing whether her child is socially transitioning at school, which conflicts with her religious beliefs. It also interferes with Plaintiff's ability to direct the upbringing, care, and wellbeing of her child by denying her the opportunity to provide guidance, support, and informed consent regarding significant decisions affecting her child's development. If any of Plaintiff's children were to assert a "gender-expansive" or "transgender" identity at school, Plaintiff knows that school staff would be required to accept that assertion and facilitate a social transition—including the use of new names and pronouns—without her knowledge or consent.

104. Facilitating this conduct conflicts with her sincerely held religious beliefs, and it excludes her from decisions bearing on her children's mental health, sense of self, and emotional well-being.

105. Plaintiff is concerned that FCPS administrators will prioritize her sons' decisions about their "chosen name and pronouns" at school over her wishes.

106. Plaintiff is concerned that they will allow her sons to use facilities and participate in activities meant for girls.

107. Plaintiff is also concerned that FCPS administrators will facilitate her sons' social transitions without her knowledge. Because the only parental notice required by the Regulation is through putting a parent on a student's "support team," she will have no way of knowing if FCPS is taking these actions unless a support team is convened. But because the Regulation only requires schools to convene a "support team" if Plaintiff or her child request one, she will have no way of learning these things if her child does not request a support team. Meanwhile, Plaintiff knows that the Regulation requires schools to take actions to facilitate transition even in the absence of a support plan.

108. Plaintiff wants to opt out of Regulation 2603 for her children so that they are never subject to this policy.

109. Plaintiff wants her children to be referred to by their given names and biological genders at school, to use the restrooms and other facilities that correspond with their biological sex, and to participate in activities and gendered classes in accordance with their biological sex.

110. Plaintiff expressed concern about Regulation 2603 with FCPS officials, but they refused to change the policy.

111. This policy has caused Plaintiff significant emotional distress because she fears that her children will be subjected to social transitioning against her fundamental values and religious beliefs, and without her knowledge.

## COUNT I
### Violation of the First Amendment
### (Free Exercise Clause)

112. Plaintiff incorporates the foregoing paragraphs as though fully restated here.

113. The First Amendment to the U.S. Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. Const. amend. I. The Free Exercise Clause applies to the states through the Due Process Clause of the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

114. This right to the free exercise of religion encompasses a parental right to guide the religious development of one's children. *Wisconsin v. Yoder*, 406 U.S. 205, 213–14, 218 (1972).

115. School district policies that facilitate a student's social gender transition without parental knowledge or consent substantially interfere with this right and trigger strict scrutiny. *Mirabelli*, 607 U.S. at 496-97.

116. Plaintiff is a Christian with sincere religious beliefs that govern her views about human nature, the complementarity of the sexes, and the immutability of sex as created by God.

117. Plaintiff has a religious obligation to guide the moral and spiritual development of her children consistent with her Christian faith.

118. FCPS Regulation 2603.3 facilitates conduct—specifically, the social gender transition of children without parental knowledge or consent—that directly conflicts with Plaintiff's sincerely held religious beliefs.

119. Regulation 2603.3 requires staff to accept a student's asserted gender identity, facilitate social transitions by using chosen names and pronouns and allowing the use of gendered spaces and participation in gendered classes and activities consistent with the student's gender identity, all without affording parents any notice, consent, or opportunity for religious exemption.

120. Defendants' policies are materially indistinguishable from the policies the U.S. Supreme Court held were likely unconstitutional in *Mirabelli*.

121. By facilitating a child's social gender transition without parental knowledge or consent, Defendants' policies substantially interfere with Plaintiff's free-exercise rights.

122. Defendants' policies cause Plaintiff to suffer on account of her religious beliefs by facilitating conduct contrary to those beliefs and concealing that conduct from her, thereby depriving her of the ability to fulfill her religious obligation to guide the moral and spiritual development of her children.

123. Defendants' policies are not narrowly tailored to achieve a compelling government interest. Defendants' asserted interests in student safety and privacy could be achieved through less restrictive means—for example, by allowing religious exemptions while limiting disclosure only where there is a credible risk of abuse.

124. Defendants' policies and practices therefore violate Plaintiff's rights under the Free Exercise Clause of the First Amendment. Plaintiff has no adequate remedy at law and suffers ongoing, irreparable harm to her constitutional rights unless Defendants are enjoined from implementing and enforcing Regulation 2603.3.

125. FCPS adopted this policy "under color of state law" within the meaning of §1983.

## COUNT II
### Violation of the Virginia Constitution
### (Free Exercise Clause)

126. Plaintiff incorporates paragraphs 1–111 of the Complaint.

127. Article I, Section 16 of the Virginia Constitution provides that "all men are equally entitled to the free exercise of religion, according to the dictates of conscience" and that "no man shall be compelled to frequent or support any religious institution, or shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief."

128. "[T]he Virginia Constitution provides more robust protections for religious liberty than the First Amendment." *Episcopal Diocese of S. Va. v. Marshall*, 81 Va. App. 255, 268 (2024) (citing *Vlaming v. W. Point Sch. Bd.*, 302 Va. 504, 540 (2023)). The Virginia Supreme Court has recognized that "constitutional guarantees of religious freedom have no deeper roots than in Virginia, where they originated, and nowhere have they been more scrupulously observed." *Reid v. Gholson*, 229 Va. 179, 187 (1985).

129. Under Virginia's free exercise clause, then, FCPS must have a "compelling state interest in protecting the public from" a "threat" posed by Plaintiff's exercise of her sincerely held beliefs that could not "be satisfied by less restrictive means." *Vlaming*, 302 Va. at 540 (cleaned up).

130. Plaintiff is a Christian with sincere religious beliefs that govern her views about human nature, the complementarity of the sexes, and the immutability of sex as created by God.

131. Plaintiff has a religious obligation to guide the moral and spiritual development of her children consistent with her Christian faith.

132. FCPS Regulation 2603.3 facilitates conduct—specifically, the social gender transition of children—that directly conflicts with Plaintiff's sincerely held religious beliefs.

133. These policies require staff to accept a student's asserted gender identity and facilitate social transitions using chosen names and pronouns, all without affording parents any notice, consent, or opportunity for religious exemption.

134. Defendants' policies are materially indistinguishable from the policies the U.S. Supreme Court held were likely unconstitutional in *Mirabelli*.

135. By facilitating a child's social gender transition without parental knowledge or consent, Defendants' policies substantially interfere with Plaintiff's free-exercise rights.

136. Defendants' policies cause Plaintiff to suffer on account of her religious beliefs by facilitating conduct contrary to those beliefs and concealing that conduct from her, thereby depriving her of the ability to fulfill her religious obligation to guide the moral and spiritual development of her children.

137. School district policies that facilitate a student's social gender transition without parental knowledge or consent do not satisfy strict scrutiny. *Mirabelli*, 607 U.S. at 496-97. Defendants' policies are not narrowly tailored to achieve a compelling government interest. Defendants' asserted interests in student safety and privacy could be achieved through less restrictive means—for example, by allowing religious exemptions while limiting disclosure only where there is a credible risk of abuse.

138. Defendants' policies and practices therefore violate Plaintiff's rights under Article I, Section 16 of the Virginia Constitution. Plaintiff has no adequate remedy at law and suffers ongoing, irreparable harm to her constitutional rights unless Defendants are enjoined from implementing and enforcing Regulation 2603.3.

**COUNT III**
**Violation of the Fourteenth Amendment**
**(Parental Exclusion)**

139. Plaintiff incorporates paragraphs 1–111 of the Complaint.

140. The Fourteenth Amendment of the United States Constitution prohibits the deprivation of liberty without due process of law.

141. The Fourteenth Amendment also protects the fundamental right of parents to direct the upbringing and education of their children. *Pierce*, 268 U.S. at 534–535; *Meyer*, 262 U.S. at 399–400. This fundamental right encompasses the right of a parent to participate in and make decisions bearing on a child's mental health. *Parham*, 442 U.S. at 602.

142. Gender dysphoria is a condition that significantly impacts a child's mental health. *Mirabelli*, 607 U.S. at 497.

143. In *Mirabelli*, the U.S. Supreme Court reaffirmed that primary authority over child-rearing rests with parents, not the State, and that policies concealing information from parents and facilitating a child's gender transition at school likely infringe upon Due Process protections. *Id.*

144. Plaintiff seeks to direct the upbringing and education of her children, including decisions about their mental health and any gender dysphoria they may experience.

145. FCPS Regulation 2603.3 creates a framework in which FCPS affirmatively facilitates social transitions—including the use of chosen names and pronouns and access to sex-

segregated facilities based on gender identity—while allowing for the exclusion of parents from knowledge of, participation in, and consent to these actions.

146. Regulation 2603.3 ensures that material decisions affecting a student's identity, social environment, and mental health are made without parental notice, involvement, or consent.

147. Plaintiff is consequently barred from making decisions about her children's mental health and any gender dysphoria they may experience.

148. Defendants' policies and practices therefore violate Plaintiff's fundamental Due Process rights under the Fourteenth Amendment of the United States Constitution. Plaintiff has no adequate remedy at law and suffers ongoing, irreparable harm to her constitutional rights unless Defendants are enjoined from implementing and enforcing Regulation 2603.3.

149. FCPS adopted this policy "under color of state law" within the meaning of §1983.

**COUNT IV**
**Violation of the Virginia Constitution**
**(Due Process Clause)**

150. Plaintiff incorporates paragraphs 1–111 of the Complaint.

151. Article I, Section 11 of the Virginia Constitution provides that no person shall "be deprived of his life, liberty, or property without due process of law."

152. The Virginia Constitution protects the fundamental right of parents to direct the upbringing and education of their children, including decisions bearing on a child's mental and emotional well-being. *L.F. v. Breit*, 285 Va. 163, 182 n. 7 (2013) ("The due process guarantees of Article I, Section 11 of the Constitution of Virginia are virtually identical to those of the United States Constitution.").

153. Gender dysphoria is a condition that significantly impacts a child's mental health. *Mirabelli*, 607 U.S. at 497.

154. In *Mirabelli*, the U.S. Supreme Court reaffirmed that primary authority over child-rearing rests with parents, not the State, and that policies concealing information from parents and facilitating a child's gender transition at school likely infringe upon Due Process protections. *Id.*

155. Plaintiff seeks to direct the upbringing and education of her children, including decisions about their mental health and any gender dysphoria they may experience.

156. FCPS Regulation 2603.3 creates a framework in which FCPS affirmatively facilitates social transitions—including the use of chosen names and pronouns and access to sex-segregated facilities based on gender identity—while allowing for the exclusion of parents from knowledge of, participation in, and consent to these actions.

157. Defendants' policies ensure that material decisions affecting a student's identity, social environment, and mental health are made without parental notice, involvement, or consent.

158. Plaintiff is consequently barred from making decisions about her children's mental health and any gender dysphoria they may experience.

159. Defendants' policies and practices therefore violate Plaintiff's fundamental Due Process rights under Article I, Section 11 of the Virginia Constitution. Plaintiff has no adequate remedy at law and suffers ongoing, irreparable harm to her constitutional rights unless Defendants are enjoined from implementing and enforcing Regulation 2603.3.

**PRAYER FOR RELIEF**

Plaintiff respectfully demands the following relief:

a. A declaration that Regulation 2603.3 violates the Free Exercise and Due Process Clauses of the U.S. and Virginia Constitutions;

b. A preliminary and permanent injunction barring Defendants from enforcing Regulation 2603.3 and any materially similar policy, provision, or law that applies in the FCPS system against Plaintiff.

c. Nominal damages;

d. Attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and Va. Code § 57-2.02;

e. Such other relief as the Court deems proper.

Dated: June 22, 2026

Respectfully submitted,

Ian Prior*
Crystal Clanton*
Rachael Griffin**
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave. SE, Suite 231
Washington, D.C. 20003
(703) 999-0273
ian.prior@aflegal.org
crystal.clanton@aflegal.org
rachael.griffin@aflegal.org

*/s/ Rachael C. T. Wyrick*
Rachael C. T. Wyrick
  (VA Bar No. 99763)
Cody R. Milner*
Marie E. Sayer**
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, Virginia 22209
(703) 243-9423
rachael@consovoymccarthy.com
cody@consovoymccarthy.com
mari@consovoymccarthy.com

* Pro hac vice motions forthcoming
** E.D. Va. bar applications forthcoming

*Counsel for Plaintiffs*