**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

STEPHANIE LUNDQUIST-ARORA,

    *Plaintiff*,

v.

FAIRFAX COUNTY SCHOOL BOARD; and
DR. MICHELLE C. REID, in her official
capacity as Superintendent of Fairfax County
Public Schools,

    *Defendants*.

Case No. 26-cv-1768

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

Table of Contents..........................................................................................................................i

Table of Authorities .....................................................................................................................ii

Introduction.................................................................................................................................. 1

Background .................................................................................................................................. 2

I.  Parental-exclusion policies are harming families across the country. ..................................... 2

II.  FCPS officials have a troubling history of concealing students' gender identity from their parents. ....................................................................................................................... 4

III.  FCPS policies violate the U.S. and Virginia Constitutions. ................................................... 7

IV.  Regulation 2603 injures Plaintiff. ......................................................................................... 9

Argument ................................................................................................................................... 11

I.  Plaintiff is likely to prevail on the merits. ........................................................................... 11

    A.  Plaintiff has standing.................................................................................................... 11

    B.  Regulation 2603 violates the Free Exercise Clause....................................................... 13

    C.  Regulation 2603 violates the Fourteenth Amendment.................................................... 18

    D.  Regulation 2603 violates article I, §16 of the Virginia Constitution. ........................... 22

    E.  Regulation 2603 violates article I, §11 of the Virginia Constitution. ........................... 23

II.  The remaining factors favor a preliminary injunction. .......................................................... 24

III.  The Court should waive the Rule 65(c) security bond. .......................................................... 25

Conclusion ................................................................................................................................. 25

CERTIFICATE OF SERVICE .................................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*CACI, Inc.-Fed. v. U.S. Navy*,
  674 F. Supp. 3d 257 (E.D. Va. 2023) ............................................................... 25

*Centro Tepeyac v. Montgomery Cnty.*,
  722 F.3d 184 (4th Cir. 2013) ......................................................................... 11

*City of Huntington Beach v. Newsom*,
  No. 25-3826 (9th Cir. Jun. 18, 2026) ............................................................. 12

*Diamond Alt. Energy, LLC v. EPA*,
  606 U.S. 100 (2025) ....................................................................................... 11

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ....................................................................................... 18

*Doe v Pine Richland Sch. Dist.*,
  2026 WL 1103489 (3d Cir. Apr. 23, 2026) ..................................................... 12

*Elrod v. Burns*,
  427 U.S. 347 (1976) ....................................................................................... 24

*Employment Division v. Smith*,
  494 U.S. 872 (1990) ....................................................................................... 23

*Episcopal Diocese of S. Va. v. Marshall*,
  81 Va. App. 255 (2024) .................................................................................. 22

*Espinoza v. Mont. Dep't of Revenue*,
  591 U.S. 464 (2020) ....................................................................................... 13

*Etheridge v. Med. Ctr. Hosps.*,
  237 Va. 87 (1989) ..................................................................................... 23, 24

*H.L. v. Matheson*,
  450 U.S. 398 (1981) ....................................................................................... 19

*J.K. v. Trustgard Ins. Co.*,
  2025 WL 3083761 (Va. Ct. App. Nov. 5, 2025) .............................................. 23

*Kaltenbach v. Hilliard City Schs.*,
  2025 WL 1147577 (6th Cir. Mar. 27) ........................................................... 3, 4

*L.F. v. Breit*,
  285 Va. 163 (2013) ................................................................................... 23, 24

*L.W. v. Skrmetti*,
  83 F.4th 460 (6th Cir. 2023) ............................................................................ 2

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
  2 F.4th 330 (4th Cir. 2021) ............................................................................ 24

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*,
  594 U.S. 180 (2021) ....................................................................................... 20

*Mahmoud v. Taylor*,
  606 U.S. 522 (2025)................................................................ 13, 14, 16, 17, 18, 20
*Meyer v. Nebraska*,
  262 U.S. 390 (1923)..................................................................................... 19
*Mirabelli v. Bonta*,
  607 U.S. 492 (2026)...................................... 1, 3, 11, 12, 13, 14, 17, 18, 19, 20, 22, 23, 24, 25
*Mirabelli v. Olson*,
  691 F. Supp. 3d 1197 (S.D. Cal. 2023)......................................................... 2
*Parents 1 v. Montgomery County Board of Education*,
  78 F.4th 622 (4th Cir. 2023) ......................................................................... 12
*Parham v. J.R.*,
  442 U.S. 584 (1979)............................................................................ 19, 20, 22
*Pierce v. Society of Sisters*,
  268 U.S. 510 (1925)....................................................................................... 19
*Short v. Hartman*,
  87 F.4th 593 (4th Cir. 2023) ......................................................................... 12
*Skrmetti*,
  605 U.S. 495 (2025)................................................................................. 2, 20
*Troxel v. Granville*,
  530 U.S. 57 (2000)............................................................................ 18, 19, 20, 21
*United States v. Williams*,
  155 F.3d 418 (4th Cir. 1988) ......................................................................... 12
*Vlaming v. W. Point Sch. Bd.*,
  302 Va. 504 (2023) ................................................................................. 22, 23
*West Virginia v. Barnette*,
  319 U.S. 624, 626 (1943)................................................................................ 13
*Wisconsin v. Yoder*,
  406 U.S. 205 (1972)............................................................................ 13, 14, 19

**Constitutional Provisions**

U.S. Const. amend. XIV ............................................................................ 18
Va. Const. art. I, §11 ................................................................................. 23
Va. Const. art. I, §16 ................................................................................. 22

**INTRODUCTION**

Under established Supreme Court precedent, parents have the right to guide the religious development of their children, and the primary authority to direct their upbringing. This includes the right not to have school "facilitation of a child's gender transition" without their consent, and the "right not to be shut out of participation in decisions regarding their children's mental health." *See Mirabelli v. Bonta*, 607 U.S. 492, 496-97 (2026). Fairfax County Public Schools is flouting those rights.

FCPS regulations require teachers and staff to actively facilitate students' gender transitions. If a student requests it, schools must (1) call "gender-expansive and transgender" students by their "chosen name and pronouns"; (2) allow them to use the opposite-gender restroom and locker room and may not require them to use single occupancy facilities or facilities that correspond with their biological sex; (3) let them bunk in rooms that align with their gender identity on overnight trips; and (4) participate in intramural sports, clubs, activities, and classes based on their preferred gender. There is no opt-out mechanism, and there is no notice requirement. Without telling the parents or obtaining their consent, schools "shall" do all the above.

Plaintiff objects to these policies, and she does not want her children subjected to them. Plaintiff wants to educate her children according to her religious beliefs that God creates each person as male or female, that complementary sexes reflect the image of God, and that sex cannot be altered. And Plaintiff wants to control how decisions are made for her children concerning these fundamentally important issues. The Court should grant Plaintiff's motion for a preliminary injunction.

1

## BACKGROUND

### I.    Parental-exclusion policies are harming families across the country.

In recent years, the number of young people experiencing gender dysphoria has surged. *See, e.g.*, *L.W. v. Skrmetti*, 83 F.4th 460, 468 (6th Cir. 2023) ("By one account, 2021 saw three times more diagnoses of gender dysphoria among minors than 2017 did."). Gender dysphoria is a "medical condition characterized by persistent, clinically significant distress resulting from an incongruence between gender identity and biological sex." *United States v. Skrmetti*, 605 U.S. 495, 502-03 (2025). Despite assertions to the contrary, "there is no medical consensus on how best to treat gender dysphoria in children." *Id*. at 530 (Thomas, J., concurring). Indeed, major scientific associations have recently flipped their positions and come out against certain interventions for children under eighteen. *See* Ex. A (noting the American Society of Plastic Surgeons and American Medical Association endorse age limits on gender-related surgery). And, according to one review, "[g]iven the weakness of the research" on the effectiveness of social transition, it is "unclear whether it alters the trajectory of gender development, and what short- and longer-term impact [it] may have on mental health." Ex. B at 163. The proper treatment of gender dysphoria raises "fierce scientific and policy debates about the safety, efficacy, and propriety of medical treatments in an evolving field." *Skrmetti*, 605 U.S. at 525. And many parents, too, have different views on the best way to help and support a child who suffers with gender confusion.

Social transition isn't a neutral response to a child experiencing such confusion. It "is an active intervention" that can have "significant effects on the child or young person in terms of their psychological functioning and longer-term outcomes." Ex. B at 158. Social transition is "'one of the most difficult psychological changes a person can experience.'" *Mirabelli v. Olson*, 691 F. Supp. 3d 1197, 1208 (S.D. Cal. 2023) (quoting testimony of Dr. Erica Anderson).

Not only is social transition a powerful psychological act, but it also makes children more likely to pursue irreversible treatments like hormones and puberty blockers down the line. Most children with gender dysphoria diagnoses do "not remain [gender dysphoric]/gender incongruent into adolescence." Ex. C. at 3879. But "[s]ocial transition is associated with the persistence of [gender dysphoria]/gender incongruence as a child progresses into adolescence." *Id*. In one study, "93% of those who socially transitioned between three and 12 years old continued to identify as transgender" five years later. Ex. B at 162. And children who are socially transitioned usually do not stop there. Instead, they go on to seek increasingly invasive "treatments," like puberty blockers, sterilizing cross-sex hormones, and surgeries. *See* Ex. D. at 14, 39-40 (finding that the majority of a group of study participants who had socially transitioned prior to the study moved on to puberty blockers and cross-sex hormones).

Despite the fact that social transition is a powerful psychological act, and despite the lack of scientific evidence supporting it, school districts across the country have adopted policies that facilitate social transition of children. Under these policies, schools encourage and support students' transitioning to a new gender without parental knowledge or consent. Often, the policies encourage schools to affirmatively hide their actions from parents. According to a list from Defending Education, there are currently 1,217 districts with these policies across the country, encompassing over 20,000 schools. *See* Ex. E.

These policies are wreaking havoc on children across the country. In some cases, parents only learn about years-long efforts to socially transition their children after the child has been the victim of bullying or suffered a mental health emergency like attempted suicide. *See, e.g.*, *Mirabelli*, 607 U.S. at 493-94; *Kaltenbach v. Hilliard City Schs.*, 2025 WL 1147577, at *1-2 (6th Cir. Mar. 27) (Thapar, J., concurring). Parental exclusion policies take parents—the ones who have

the most comprehensive understanding of their own children—out of the equation and substitute the state as the decisionmaker. And when parents are kept in the dark, they can't provide the emotional support or secure the medical care that their children need. *Id.* at *2 (Thapar, J., concurring) (schools, through "deception," "stri[p] them of that possibility").

## II.    FCPS officials have a troubling history of concealing students' gender identity from their parents.

Fairfax County is no exception to this troubling trend. FCPS first established a "Gender-Expansive and Transgender Students" regulation pursuant to the School Board's non-discrimination policy in 2020 to "establish procedures and guidelines" to "ensure" that "gender-expansive and transgender students experience a safe, supportive, and inclusive school environment." Ex. F at 1. Regulation 2603 requires schools to affirm a student's gender identity by using the student's chosen name and pronouns and allowing the student to access intimate facilities and activities based on gender identity. *Id*. at 3-5; *see also* Ex. G at 3-5. It also creates a "support team" to "develop a student-specific support plan" for "gender-expansive and transgender student[s]." Ex. F at 2; Ex. G at 2. The Regulation has been updated twice, and with the 2022 iteration—Regulation 2603.2—FCPS also issued a "guidance document" as a "tool" expanding on the regulation. Ex. M at 3.

In April 2026, after Plaintiff sent a letter to Defendants outlining the unconstitutionality of Regulation 2603.2 and the accompanying guidance document, Ex. I, Defendants revoked the guidance document and adopted a revised policy, Regulation 2603.3, Ex. H. But despite the revisions, the essential aspects of the social transition regulation remain unchanged, continuing to reflect FCPS's longstanding approach to student social transitions. Indeed, the earlier guidance document and testimony of FCPS officials made clear that FCPS's goal is to facilitate students' social transitions without input from their parents.

For example, Bethany Demers, an FCPS representative from the Office of Intervention and Prevention Services, testified under oath about Regulation 2603.2. Ms. Demers testified that a student would not need to inform staff before using a restroom corresponding to their chosen gender identity: "They don't need to inform and when we are made aware, we would have that conversation with that student." Ex. J at 71. She confirmed that "the school is not required to notify parents just for using the restroom." *Id*. at 72.

And Michael Axler, FCPS's Director of Intervention and Prevention Services, similarly testified that under Regulation 2603.2 and FCPS guidance on its implementation, "students are able to assert their gender identity and are able to request that they be called by chosen name and pronouns and use facilities that correspond with their gender identity with or without their parents providing permission." Ex. K at 84-85. Mr. Axler further confirmed that under Regulation 2603.2, if a parent objected to a student's transgender status being acknowledged at school, the school "wouldn't rescind the student's ability to be referred to by their chosen name or pronoun or access facilities that correspond to the gender identity based on parental [p]reference." *Id*. at 139.

Penny Gros, a former Assistant Superintendent for FCPS, confirmed under oath that a training slide used by FCPS stated: "Students can change their name and gender without permission of legal documentation." Ex. L at 107. Ms. Gros further testified that she imagined "there are students that ask to be called something and no one is calling home to say, 'Hey, by the way, today your child asked me to call them something different.'" *Id*. at 80.

The guidance document that expanded on Regulation 2603.2 was even more explicit. The guidance document said schools "shall not disclose confidential information related to the student's transition with the parents or guardians" if the student had not yet shared that information with their parents. Ex. M at 8. It explained that "[s]tudents may choose to have their parents

5

participate in [the transitioning] process; however, parental participation is not required." *Id.* at 7-8. Per the guidance document, notifying parents is "[g]enerally … unnecessary," and before parents or guardians could be notified about a student's transition, "school staff should work closely with the student to assess the degree to which, if any, the parent or guardian will be involved in the process and must consider the health, wellbeing, and safety of the transitioning student." *Id.* at 8–9.

The guidance document also established procedures to affirmatively hide gender-identity related information from parents by creating parallel record systems so that parents wouldn't be made aware of changes to their child's name and information by reading it in student records. "If a student transitioning at school is not ready to share with their family about their transgender status, this should be respected. In this scenario, school staff should make a change socially, calling the student by the chosen name, while their official SIS information remains the same." *Id.* at 10. It also encouraged using a child's legal name when talking to parents and not keeping written records that would be subject to disclosure under the Family Educational Rights and Privacy Act. *Id.*

Ms. Demers confirmed the reason for these policies. She stated in an email that: "The biggest reason this is optional is that it may unintentionally out the student to the parents. For example, if the student is not out to their parent and the parent conducted a FERPA request, this would need to be included which would then out the student." *Id.* at 82–83. And Mr. Axler explained the rationale for not requiring parental notification: "The reason it is not required is there are certain circumstances where a student has not disclosed their transgender identity to their parents and this note, situations where students have noted that they would be at risk of harm if their parents were made aware." Ex. K at 43–44.

### III.    FCPS policies violate the U.S. and Virginia Constitutions.

Following a demand letter from Plaintiffs requesting that FCPS rescind Regulation 2603.2, FCPS made minor changes to the regulation that maintain its core purpose: facilitating students' social transition without parental input. Regulation 2603.3, the third iteration of FCPS's regulation for "Gender-Expansive and Transgender Students," will take effect July 1, 2026. Ex. H.

The regulation lays out a "support team" framework for "provid[ing] the gender-expansive or transgender student with safe and equitable access to all school and school division facilities and activities." *Id*. at 2. The support team creates a "support plan" to help facilitate any "accommodations" the student might need, including "check-ins" with counselors, information about community resources, plans to "inform appropriate teachers, coaches and other personnel of the student's chosen name/pronouns," and potential training for staff on gender diversity. *Id*. at 2-3.

In addition to the support team, Regulation 2603.3 mandates several ways that schools must facilitate the social transition of students who identify as "gender-expansive or transgender" without parental consent. First, the Regulation mandates the use of a student's "chosen name and pronouns" at school "regardless of the name and gender recorded in the student's permanent pupil record." *Id*. at 3. Students' chosen names and gender markers will also be used in "school documents such as yearbooks and communications to outside media." *Id.* at 4.

Second, the Regulation requires that the school allow students to use facilities and participate in activities in accordance with their gender identity, all without parental consent. *Id*. at 4-5. Students must be given "the option of using a locker room or restroom consistent with the student's gender identity." *Id*. at 4. If students are on overnight trips, they may be assigned a room consistent with their gender identity. *Id*. "In no case" can the student be required to use a facility

that "conflicts with the student's gender identity or be limited to using only a private area, single-occupancy accommodation, or other single-use facility." *Id*. at 5. For gender-specific courses, non-Virginia High School League sports, clubs, activities, or other school-sponsored programs, a student "shall" be allowed to participate in the program "corresponding with the student's gender identity." *Id*. Even for classes with certain gender-specific units, like Family Life Education, a student "shall be allowed to participate with the gender group corresponding to the student's gender identity." *Id*.

All of this is required without parental approval, and there is no way in the policy for parents to opt-out or prevent school staff from applying the policy to their child. In fact, the policy does not even require schools to notify parents if their child requests to socially transition at school. As the guidance document expanding on how schools should implement the last iteration of Regulation 2603 explained, "[t]here are no regulations requiring school staff to notify a parent or guardian of a student's request to affirm their gender identity." Ex. M at 8. That guidance document is no longer operative, but Regulation 2603.3 has not been changed to include any such notice requirement. *Compare* Ex. G *with* Ex. H.

Regulation 2603.3 updates the support team framework to include the student's parent, but it still does not ensure parental knowledge or consent. Under the new Regulation, the school will only "convene a support team" if a "student or parent" requests one. Ex. H at 2. But until the support team exists, the school is under no obligation to notify parents that their child is struggling with their gender, even while they *are* under an obligation to facilitate the student's social transition in the ways outlined above. If a student never requests a support team, the school will continue to facilitate the student's transition without any parental notification, consent, or involvement, and the parents would have no way to know they should consider asking for a support

8

team. Moreover, the support team contemplates the parent as just one member on a "multidisciplinary team." *Id*. It does not give the parent authority to overrule support plans implemented by the rest of the team, or even to opt out of having a support team altogether.

### IV.    Regulation 2603 injures Plaintiff.

Regulation 2603 harms Plaintiff. Plaintiff has three children enrolled in Fairfax County Public Schools. Lundquist-Arora Decl. ¶3. Plaintiff's oldest son finished his junior year and her middle son finished his freshman year in an FCPS high school. *Id*. Her youngest son finished seventh grade at an FCPS middle school. *Id*. All three children will continue to attend FCPS middle and high schools next year, as a senior, a sophomore, and an eighth grader. *Id*.

Plaintiff is a practicing Christian who strives to live in accordance with her faith. *Id*. ¶4. She has consistently raised her children in her Christian faith. *Id*. She believes that there are only two sexes: male and female. *Id*. ¶5. She believes that God creates each person as male or female, that complementary sexes reflect the image of God, that sex cannot be altered, and that rejection of one's biological sex is a rejection of the image of God within that person. *Id*. ¶¶5-6. Her beliefs govern her views on human nature, marriage, gender, sexuality, morality, politics, ethics, natural law, and social issues. *Id*. ¶5.

Plaintiff therefore does not believe her children can be "gender-expansive" or "transgender." *Id*. ¶7. She thinks referring to another person using pronouns that do not correspond with biological sex is harmful to that person because it is false. *Id*. ¶6. And she believes she has a religious obligation to raise her children in accordance with her beliefs. *Id*. ¶10. She is opposed to FCPS's acceptance, encouragement, and facilitation of students self-selecting genders and pronouns. *Id*. ¶12.

9

Plaintiff knows of Regulation 2603, and she knows her children, like all children, may at some point during adolescence be susceptible to the influence of gender ideology. *Id*. ¶¶8, 12-13, 18. Plaintiff wants to opt out of Regulation 2603 for her children so that they are never subjected to the policy. *Id*. ¶25. And Plaintiff wants to be notified if the school facilitates her children's transition in any way. *Id*. ¶14. She wants to exercise her fundamental right as a parent to guide her child's upbringing and help them navigate any issues that may arise regarding their perception of their gender identity. *Id*. ¶15. She wants her children to be referred to by their given names and biological genders at school, to use the restrooms and other facilities that correspond with their biological sex, and to participate in activities and gendered classes in accordance with their biological sex. *Id*. ¶26. But the Regulation prevents her from doing that. *Id*. ¶¶18-19. FCPS will not allow Plaintiff to opt out of Regulation 2603, and it will not notify her before it facilitates her child's transition. *Id*. ¶¶20, 24. This is causing Plaintiff psychological harm because she is constantly worrying whether the school is facilitating her child's transition behind her back. *Id*. ¶28.

Under FCPS's regulation, Plaintiff has no way to determine whether FCPS has facilitated the social gender transition of her children at school. *Id*. ¶¶20, 24. And if any of Plaintiff's children were to assert a gender-expansive or transgender identity at school, school staff would be required to accept that assertion and facilitate a social transition—including the use of new names, pronouns and facilities that do not correspond with their biological sex. *Id*. ¶¶18-19. Subjecting Plaintiff's children to the policies outlined in Regulation 2603 violates Plaintiff's religious beliefs because they endorse world views that directly conflict with Plaintiff's Christian faith. *Id*. ¶¶20-21. And it violates her right to control and care for her children the way she sees fit. *Id*.

10

**ARGUMENT**

Plaintiff is entitled to a preliminary injunction if she can show four things: (1) that she is "likely to succeed on the merits," (2) that she is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in [her] favor," and (4) "that an injunction is in the public interest." *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 188 (4th Cir. 2013) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). She proves all four.

## I.    Plaintiff is likely to prevail on the merits.

Regulation 2603 hides important information about students from their parents, and it tells teachers and administrators to facilitate students' transitions without parents' approval. Plaintiff has standing to challenge the Regulation, and the Regulation likely violates the Free Exercise and Due Process Clauses of both the U.S. and Virginia Constitutions.

### A.  Plaintiff likely has standing.

To start, Plaintiff has standing to challenge Regulation 2603. In order to demonstrate standing, plaintiffs must show injury, causation, and redressability. *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 111 (2025).

The Supreme Court explained what is necessary to establish standing to challenge parental exclusion policies in *Mirabelli v. Bonta*. There, the district court certified a class comprising all parents "who object to the challenged policies," and another of those "who seek a religious exemption." 607 U.S. at 494-95. The Ninth Circuit claimed some class members lacked sufficient standing to sue. *Id*. at 495. The Supreme Court disagreed. It affirmed that those parents "very likely have standing because they are objects of the challenged exclusion policies." *Id*. at 498. As one recent circuit court decision explained, under *Mirabelli*, parents need not make "any individualized

11

showing as to whether [their] child was likely to exhibit gender dysphoria" to show standing; they only need to show that "they were the 'objects' of the challenged" law. *City of Huntington Beach v. Newsom*, No. 25-3826, slip op. at 5, 8 (9th Cir. Jun. 18, 2026); *see also Doe v Pine Richland Sch. Dist.*, 2026 WL 1103489, at *3 (3d Cir. Apr. 23, 2026) (explaining that under *Mirabelli*, a plaintiff had standing because "she (1) was the parent of a child in a District school; (2) as such, was the object of the District's Policy; and (3) demanded that the District not apply the Policy to her"). *Mirabelli* thus "clearly undermine[s]" the Fourth Circuit's decision in *Parents 1 v. Montgomery County Board of Education*, 78 F.4th 622 (4th Cir. 2023). *See United States v. Williams*, 155 F.3d 418, 421 (4th Cir. 1988). In *Parents 1*, the Fourth Circuit determined that parents who did not allege their children were currently subject to a support plan or having discussions with school officials about gender identity lacked Article III standing. 78 F.4th at 629. That decision is "impossible to reconcile" with *Mirabelli*'s determination that the class of parents challenging California's parental exclusion law likely had standing. *See Short v. Hartman*, 87 F.4th 593, 605 (4th Cir. 2023).

Plaintiff's standing is no different than the parents in *Mirabelli*. As a parent of students at Fairfax County Public Schools, she has a personal stake in this dispute. Lundquist-Arora Decl. ¶3. Under Regulation 2603, if one of her sons expresses confusion about his gender at school and seeks to transition socially, the school is required to treat her son as a girl by calling him by a different name and female pronouns, let him use the girl's restrooms and locker rooms and room with girls on school trips, and put him in intramural sports, clubs, and activities with girls. *See* Ex. H at 3-5. They must do all this without obtaining Plaintiff's consent, and they are not required to even give her notice before taking steps to facilitate the child's transition. *Id*. Thus, as an "object" of Regulation 2603, Plaintiff has standing to challenge it. *Mirabelli*, 607 U.S. at 498.

### B. Regulation 2603 violates the Free Exercise Clause.

Courts have "long recognized the rights of parents to direct 'the religious upbringing' of their children." *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 486 (2020). For many people of faith, "there are few religious acts more important than the religious education of their children." *Mahmoud v. Taylor*, 606 U.S. 522, 547 (2025). "At its heart, the Free Exercise Clause of the First Amendment protects 'the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of' religious acts," including "[t]he practice of educating one's children in one's religious beliefs." *Id*. at 546-47. *Mirabelli* could not be clearer that policies allowing the "unconsented facilitation of a child's gender transition" violate parents' right to "guide the religious development of their children." 607 U.S. at 496.

The right "extends" beyond one's own home, to "the choices that parents wish to make for their children outside the home," including in public schools. *Mahmoud*, 606 U.S. at 547. For example, in *West Virginia v. Barnette*, the Court addressed a public-school policy compelling student participation in the Pledge of Allegiance. 319 U.S. 624, 626 (1943). Students and parents who objected believed the flag to be a "graven image." *Id*. at 629. That policy was unconstitutional because its effect was to "condition access to public education on making a prescribed sign and profession" contrary to the parents' religious beliefs, while the State "at the same time coerce[d] attendance by punishing both parent and child." *Id*. at 630-31.

And in *Wisconsin v. Yoder*, the Court addressed a policy that compelled student attendance in school until the age of sixteen. 406 U.S. 205 (1972). Amish parents refused to send their children to school after eighth grade because they believed it would result in "impermissible exposure of their children to a 'worldly' influence in conflict with their beliefs." *Id*. at 211. The Court explained that for those students, school attendance would "plac[e] Amish children in an environment hostile

13

to Amish beliefs" and "interpos[e] a serious barrier to the integration of the Amish child into the Amish religious community." *Id*. at 211-212. Thus, the policy was unconstitutional as applied to the Amish because it violated the "fundamental interest of parents … to guide the religious future and education of their children." *Id*. at 232.

Just last year, the Court distilled further parents' rights to direct their children's religious instruction. In *Mahmoud*, parents challenged a school policy that required teachers to read "LGBTQ+-inclusive" books to students that were "unmistakably normative" and "present[ed] as a settled matter a hotly contested view of sex and gender that sharply conflicts with the religious beliefs [many] parents wish to instill in their children." 606 U.S. at 550, 553. Because the policy "with[e]ld notice and opt outs," it "unconstitutionally burden[ed]" parents' religious exercise. *Id*. at 545, 569. *Mahmoud* clarifies that school policies that "substantially interfere with the religious development" of children must survive strict scrutiny. *Id*. at 565 (cleaned up). Though courts usually look to whether policies are neutral and generally applicable, for policies that impose burdens "of the same character as that imposed in *Yoder*," strict scrutiny applies. *Id*. at 564.

Regulation 2603 mirrors the policy in *Mirabelli* in every relevant way. It allows the "unconsented facilitation of a child's gender transition," *Mirabelli*, 607 U.S. at 496, and "permit[s] disclosure of a student's gender transitioning at school only if the student consent[s]," *id*. at 493. Under Regulation 2603, students "should be called by their chosen name and pronouns," without parental consent, even if parents have a religious objection to their child being referred to with pronouns and names that do not correspond to the sex that God created them to have. Ex. H at 3. While FCPS requires some electronic records to reflect names and pronouns "designated by students *and* parents," *id.* at 4 (emphasis added), other school records and documents contain no such parental consent requirement. For records like "yearbooks and communications to outside

14

media" the school will refer to students "by their chosen names and appropriate gender markers," regardless of the parents' view. *Id.*

The same is true for student activities and facility use. Regulation 2603.3 broadly states that students "shall be permitted to participate in accordance with [their] gender identity" in circumstances where "students are separated by gender," at FCPS schools, and nothing in the Regulation requires parents to consent beforehand. *Id.* at 5. Clubs, programs, activities, and even non-Virginia High School League sports "shall allow gender-expansive and transgender students to participate in accordance with the student's gender identity," without regard to what the student's parents believe. *Id.* And for any classes that require gender-specific instruction, "gender-expansive and transgender students shall be allowed to enroll in the course corresponding with the student's gender identity," regardless of whether their parent approves. *Id.* Students should also be "provided with the option of using a locker room or restroom consistent with the student's gender identity," regardless of whether parents agree. *Id.* at 4. And students may be "assigned to a room consistent with the student's gender identity" on school trips, even if parents have not consented. The Regulation even provides that "[i]n no case shall a gender-expansive or transgender student be required to use a locker room or restroom that conflicts with the students' gender identity or be limited to using only a private area [or] single-occupancy accommodation." *Id.* at 5. So even if parents have a religious objection to their child's use of facilities or hotel rooms that do not conform with the child's biological sex, Regulation 2603 provides that the student *must* be allowed to use the opposite-gender facilities. *Id.*

Moreover, nothing in Regulation 2603.3 requires parental notice when a school becomes aware that a student is questioning his or her gender or before taking actions to facilitate a child's transition, and so it gives parents no way to prevent the school from taking actions against their

15

religious beliefs. *Id*. Though the Regulation provides that schools can "convene a support team" that includes the parent to "develop a student-specific support plan" for gender-expansive and transgender-identifying students, the school will only do so if a "student or parent" requests one. *Id*. at 2. Until the support team exists, a parent who has been kept in the dark would have no way to know if her child was struggling with his gender. Parents who don't know about their child's struggles would have no reason to request a support team. If a student never requests a support team, the school could continue to facilitate the student's transition without any parental notification, consent, or involvement. In addition, even if a support team is convened, there is nothing in the Regulation that requires parents to be regularly updated. At best, the student's support plan "may" allow parents to "request that the support team be reconvened" and attend "annual conferences," but the Regulation does not impose a duty on the part of the school to keep parents informed. *Id*. at 2.

Nowhere does Regulation 2603 provide for parents to opt out or require parents to be notified before schools facilitate their child's social transition with names, pronouns, participation in school activities, and the use of school facilities. Like many others who "believe that biological sex reflects divine creation, that sex and gender are inseparable, and that children should be encouraged to accept their sex and to live accordingly," *Mahmoud*, 606 U.S. at 552, Plaintiff sincerely believes that calling her children by new names and pronouns that do not conform with their biological sex would be lying to them, would violate the teachings of her faith, and would be failing in her duty to raise them in their Christian faith, Lundquist-Arora Decl. at ¶¶6-7, 12. And she believes allowing them to use facilities and participate in gender-segregated clubs contrary to their biological sex would fail to honor the bodies that God gave them. *Id.* at ¶¶6, 21. These beliefs "relate to 'the very architecture' of [Plaintiff's] fait[h]." *Mahmoud*, 606 U.S. at 591 n.7 (Thomas,

16

J., concurring). Under Regulation 2603.3, if Plaintiff's children experience gender dysphoria, their school is *required* to facilitate their social transition in all these ways despite her beliefs, and Plaintiff would never be the wiser. *See* Ex. H at 3 ("Students who identify as gender-expansive or transgender *should* be called by their chosen name and pronouns by staff regardless of the name and gender recorded in the student's permanent pupil record."). And even if Plaintiff does become aware of the school's actions, the policy affords her no ability to prevent or reverse the social transition once school personnel have implemented it.

Even the regulation's provision allowing the parent to be a part of a student support team—if one is constituted—fails to give parents meaningful control over their children's religious education. First, the Regulation only makes the parent one voice of many in the group; it does not give the parent the ability to override the decisions of the group when they conflict with the parent's deeply held religious beliefs. Ex. H at 2. Second, there is no opt out mechanism. For many parents, including Plaintiff, mere participation in a system that refers to their child as "gender-expansive or transgender" violates their religious beliefs. *See Mahmoud*, 606 U.S. at 552; *see also* Lundquist-Arora Decl. ¶17.

Regulation 2603 thus "impose[s] the kind of burden on religious exercise that *Yoder* found unacceptable" by interfering with parents' "sincere religious beliefs about sex and gender" and "religious obligation to raise their children in accordance with those beliefs." *Mirabelli*, 607 U.S. at 496 (cleaned up). And just like in *Mirabelli*, Regulation 2603 "will likely not survive … strict scrutiny." *Id*. To do so, FCPS would need to demonstrate that it "advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Mahmoud*, 606 U.S. at 565 (quoting *Fulton v. Philadelphia*, 593 U.S. 522, 541 (2021)). It can't show either. The Regulation cannot serve a compelling interest in "student safety and privacy" by "cut[ting] out the primary protectors

17

of children's best interest: their parents." *Mirabelli*, 607 U.S. at 496-97. And even if it could, that interest could be served through a narrower means that "allows religious exemptions while precluding gender-identity disclosures to parents who would engage in abuse." *Id*. at 497. To survive strict scrutiny, policies must give parents the ability to "have their children opt out of a particular educational requirement that burdens their well-established right to 'direct the religious upbringing of their children.'" *Mahmoud*, 606 U.S. at 568 (quoting *Espinoza*, 591 U.S. at 486) (cleaned up).

For these reasons, as *Mirabelli* makes clear, Plaintiff is likely to succeed on the merits of her First Amendment claim. 607 U.S. at 496-97.

### C.  Regulation 2603 violates the Fourteenth Amendment.

"Under long-established precedent, parents—not the State—have primary authority with respect to 'the upbringing and education of children.'" *Mirabelli*, 607 U.S. at 497. And again, *Mirabelli* controls. Parents have "the right not to be shut out of participation in decisions regarding their children's mental health," including "gender dysphoria." *Id*.

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Under binding precedent, the Amendment "includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'" *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). Among those are rights that are "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022) (quoting *Glucksberg*, 521 U.S. at 721). The "liberty interest … of parents

in the care, custody, and control of their children[] is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel*, 530 U.S. at 65 (plurality opinion).

Recognition of the right dates back to *Meyer v. Nebraska*, where the Court recognized the rights of parents to "control the education of their own" children. 262 U.S. 390, 401 (1923). There, in considering a teacher's conviction for teaching children German, the Court emphasized "the right of parents to engage him so to instruct their children." *Id*. at 400. And in *Pierce v. Society of Sisters*, the Court held that Oregon could not compel parents to send their children to public schools instead of religious ones because doing so would "unreasonably interfer[e] with the liberty of parents and guardians to direct the upbringing and education of children under their control." 268 U.S. 510, 534-35 (1925). The Court recognized that "[t]he child is not the mere creature of the State." *Id*. at 535. Instead, parents—who "nurture" and "direct" their children's "destiny"—"have the right, coupled with the high duty, to recognize and prepare" their children for their future "obligations." *Id*. From these cases and many others, *see Troxel*, 530 U.S. at 66 (collecting cases), the "primary role of parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Yoder*, 406 U.S. at 232.

Thus, "'[i]t is cardinal'" that "'the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.'" *Troxel*, 530 U.S. at 65-66 (plurality opinion). Parents' rights "presumptively includ[e] counseling [their children] on important decisions." *H.L. v. Matheson*, 450 U.S. 398, 410 (1981). The right "to decide what is best for the child" means that parents "can and must make … judgments" in areas like children's "need for medical care or treatment." *Parham v. J.R.*, 442 U.S. 584, 603-04 (1979); *Mirabelli*, 607 U.S. at 497. And the right does not disappear at school. Both *Meyer* and *Pierce* specifically considered the rights of parents to control

19

the education of their children. "Parents do not implicitly relinquish all [their parental rights] when they send their children to a public school." *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 202 (2021) (Alito, J., concurring).

A child's gender identity implicates the most fundamental issues concerning the child, including religion, medical care, sense of self, and mental and emotional well-being. Plaintiff and her children, along with many other families, share the religious beliefs that sex is assigned by God, that sex and gender are inseparable, and that children should be taught to accept the bodies that God gave them. *See Mahmoud*, 606 U.S. at 552. Moreover, gender dysphoria is a medical condition that significantly impacts a child's mental health, *see Mirabelli*, 607 U.S. at 497; *Skrmetti*, 605 U.S. at 502, where parents' roles are key because children "simply are not able to make sound judgments," *Parham*, 442 U.S. at 603.

But despite the "extensive precedent" making clear that parents must be involved in decisions concerning these issues, *Troxel*, 530 U.S. at 66 (collecting cases), FCPS leaves them out. Regulation 2603 deprives Plaintiff of her right to know what actions FCPS is taking regarding fundamentally important decisions about her children. Plaintiff wants to be told if her children have made requests or expressed confusion about their gender before the school takes actions with regard to her children's gender identity, and she wants to be told what actions they plan to take. Lundquist-Arora Decl. ¶14. But under the Regulation, the school is not required to tell her any of this information. *Id*. ¶¶20, 24. It is impossible for parents to direct the "care, custody, and control" of their children when the school withholds critical information from them. *Troxel*, 530 U.S. at 65-66 (plurality opinion).

In addition to keeping her in the dark about decisions regarding her children's mental health, the Regulation also deprives Plaintiff of the right to have any input or control over these

fundamental decisions. Without parents' consent, Regulation 2603 requires the school to (1) call students by the names and pronouns they prefer; (2) use students' preferred names and pronouns on yearbooks and external communications; (3) allow students to use the restrooms and locker rooms that correspond with their preferred gender identity; (4) assign students to hotel rooms on overnight trips based on their preferred gender identity; and (5) participate in clubs, intramural sports, and other activities that correspond with the students' gender identity. Ex. H at 3-5. These are fundamental decisions about a child's life, and Plaintiff has the right to be the one making them.

Even Regulation 2603.3's support team framework does not cure this problem. All the Regulation requires is that the parent be given a spot in the group—if a group is even requested—but the parent is only one voice of many. *Id*. at 2. The Regulation doesn't give the parent the authority to override the decisions of the rest of the support team, and so it fails to give the required "special weight to the parent's own determination." *Troxel*, 530 U.S. at 70 (plurality opinion). Moreover, the Regulation has no way for parents to opt out of the support team altogether, requiring them to participate in a system designed for students who are "gender-expansive or transgender," even if parents, like Plaintiff, believe gender and sex are immutable, inseparable, and binary. Lundquist-Arora Decl. ¶¶5-6, 17.

The government must afford a "presumption of validity" to parental decisions unless there is clear evidence to the contrary. *Troxel*, 530 at 67 (plurality opinion). As "long as a parent adequately cares for his or her children, (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id*. at 68-69. FCPS may be concerned that some parents might disagree with a student's desire to transition, but "[s]imply

because the decision of a parent is not agreeable to a child … does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603. Nor does a fear that some parents might react badly to learning about their child's desires justify FCPS's Regulation. The "notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition." *Id*.

As *Mirabelli* makes clear, Regulation 2603 infringes on Plaintiff's right to direct the upbringing of her children. Plaintiff is likely to succeed on the merits of her Fourteenth Amendment claim. 607 U.S. at 497.

### D.  Regulation 2603 violates article I, §16 of the Virginia Constitution.

The Free Exercise Clause of the Virginia Constitution states that "all men are equally entitled to the free exercise of religion, according to the dictates of conscience." Va. Const. art. I, §16. It promises that "[n]o man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever, nor shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief," and that "all men shall be free to profess and by argument to maintain their opinions in matters of religion." *Id*. The Supreme Court of Virginia has declared that the "'constitutional guarantees of religious freedom have no deeper roots than in Virginia, where they originated, and nowhere have they been more scrupulously observed.'" *Vlaming v. W. Point Sch. Bd.*, 302 Va. 504, 528 (2023) (quoting *Reid v. Gholson*, 229 Va. 179, 187 (1985)).

The Virginia Free Exercise Clause "provides more robust protections for religious liberty than the First Amendment." *See Episcopal Diocese of S. Va. v. Marshall*, 81 Va. App. 255, 268 (2024) (citing *Vlaming*, 302 Va. at 544). The Virginia Supreme Court explains that "the

22

constitutional right to free exercise of religion is among the 'natural and unalienable rights of mankind'" only to be limited to prevent "overt acts against peace and good order." *Vlaming*, 302 Va. at 537. The government has a "duty" to "accommodate religious liberties that do not transgress these limits" and "exempt religiously motivated conduct from these laws up to the point that such conduct breached the public peace or safety." *Id*. at 537-38. The court has thus rejected the federal standard for laws of neutral applicability set out in *Employment Division v. Smith*, 494 U.S. 872 (1990), in favor of strict scrutiny, *see Vlaming*, 302 Va. at 538.

Under Virginia's free exercise clause, then, FCPS must have a "compelling state interest in protecting the public from" a "threat" posed by Plaintiff's exercise of her sincerely held beliefs that could not "be satisfied by less restrictive means." *Id*. at 540 (cleaned up). As discussed, without allowing the "primary protectors of children's best interest" a say prior to facilitating a social transition, and without providing an exemption, Regulation 2603 neither serves a compelling state interest nor is narrowly tailored. *See Mirabelli*, 607 U.S. at 496-97. Because it cannot pass strict scrutiny, *see supra* I.B., Regulation 2603 violates the Virginia Free Exercise Clause. Plaintiff is likely to succeed on the merits of her claim under article I, §16 of the Virginia Constitution.

### E.  Regulation 2603 violates article I, §11 of the Virginia Constitution.

The Virginia Constitution's Due Process Clause states "[t]hat no person shall be deprived of his life, liberty, or property without due process of law." Va. Const. art. I, §11. These guarantees "are virtually identical to those of the United States Constitution," *L.F. v. Breit*, 285 Va. 163, 182 n.7 (2013), and protect "[b]oth procedural and substantive rights," *Etheridge v. Med. Ctr. Hosps.*, 237 Va. 87, 97 (1989). "Because the rights guaranteed by the federal and state Constitutions are coextensive," the "same due process analysis" applies. *J.K. v. Trustgard Ins. Co.*, 2025 WL 3083761, *3 (Va. Ct. App. Nov. 5, 2025) (cleaned up) (discussing fundamental parental rights).

23

Just like the federal due process right, laws that implicate a "fundamental right" must pass "strict scrutiny," meaning they "must be necessary to promote a compelling or overriding governmental interest." *Etheridge*, 237 Va. at 97. And "a parent's right to raise his or her children [is] 'perhaps the oldest of the fundamental liberty interests.'" *L.F.*, 285 Va. at 182 (quoting *Troxel*, 530 U.S. at 65). Because, as discussed above, *supra* I.C., Regulation 2603 infringes Plaintiff's fundamental rights under the Fourteenth Amendment's Due Process Clause, it also infringes her rights under Virginia's Due Process Clause. Plaintiff is likely to succeed on the merits of her claim under article I, §11 of the Virginia Constitution.

## II.    The remaining factors favor a preliminary injunction.

The remaining factors also counsel in favor of a preliminary injunction. Plaintiff is suffering irreparable harm because her First and Fourteenth Amendment rights are being violated. "Because there is a likely constitutional violation, the irreparable harm factor is satisfied." *See Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Mirabelli*, 607 U.S. at 497 ("The denial of plaintiffs' constitutional rights during the potentially protracted [legal] process constitutes irreparable harm.").

The balance of the equities also favors preliminary relief. First, FCPS "is in no way harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional." *Leaders of a Beautiful Struggle*, 2 F.4th at 346. Second, "it is well established that the public interest favors protecting constitutional rights." *Id*. Perhaps most importantly, "children's safety is the overriding equity," and an injunction "promotes child safety

24

by guaranteeing fit parents a role in some of the most consequential decisions in their children's lives." *Mirabelli*, 607 U.S. at 497.

### III.    The Court should waive the Rule 65(c) security bond.

Rule 65(c) permits a court to levy a bond upon the grant of a preliminary injunction, but the court "'retains the discretion to set the Rule 65(c) bond amount as it sees fit or waive the security requirement.'" *CACI, Inc.-Fed. v. U.S. Navy*, 674 F. Supp. 3d 257, 281 (E.D. Va. 2023) (cleaned up) (quoting *Pashby v. Delia*, 709 F. 3d 307, 332 (4th Cir. 2013)). The Court should waive the bond requirement here because Defendants do not risk any significant financial expense complying with the injunction, "the public interest" favors Plaintiff, and Plaintiff has a "strong likelihood of success on the merits." *CACI, Inc.-Federal*, 674 F. Supp. 3d at 281.

### CONCLUSION

For these reasons, this Court should preliminarily enjoin Defendants from enforcing FCPS Regulation 2603 against Plaintiff.

Dated: June 22, 2026

Ian Prior*
Crystal Clanton*
Rachael Griffin**
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave. SE, Suite 231
Washington, D.C. 20003
(703) 999-0273
ian.prior@aflegal.org
crystal.clanton@aflegal.org
rachael.griffin@aflegal.org

Respectfully submitted,

*/s/ Rachael C. T. Wyrick*
Rachael C. T. Wyrick
  (VA Bar No. 99763)
Cody R. Milner*
Marie E. Sayer**
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, Virginia 22209
(703) 243-9423
rachael@consovoymccarthy.com
cody@consovoymccarthy.com
mari@consovoymccarthy.com

* Pro hac vice motion forthcoming
** E.D. Va. bar applications pending

*Counsel for Plaintiffs*

25

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2026, I served the foregoing document with the Clerk of Court using the Court's ECF system, thereby serving all counsel who have appeared in this case. Because Defendants have not yet appeared, I also served them by email and mail at the address below:

Fairfax County School Board

Dr. Michelle Reid, Superintendent

8115 Gatehouse Road

Falls Church, VA 22042

DATED: June 22, 2026

*/s/ Rachael C. T. Wyrick*
Rachael C. T. Wyrick
  (VA Bar No. 99763)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, Virginia 22209
(703) 243-9423
rachael@consovoymccarthy.com

26