# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

STEPHANIE LUNDQUIST-ARORA,

    *Plaintiff*,

v.

FAIRFAX COUNTY SCHOOL BOARD; and
DR. MICHELLE C. REID, in her official
capacity as Superintendent of Fairfax County
Public Schools,

    *Defendants*.

Case No. 26-cv-1768

## PLAINTIFF'S REPLY IN SUPPORT OF
## MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Table of Contents.................................................................................................................. i

Table of Authorities ............................................................................................................ ii

Introduction......................................................................................................................... 1

Argument ............................................................................................................................ 2

I.   Plaintiff's motion is justiciable. ................................................................................. 2

    A.   Plaintiff likely has standing. ............................................................................ 2

    B.   Plaintiff's claims are ripe. ............................................................................. 10

II.   Plaintiff is likely to succeed on the merits of each claim. ..................................... 11

    A.   FCPS misreads the Regulation........................................................................ 11

    B.   FCPS agrees with Plaintiff's legal arguments on the due process claims. ................... 16

    C.   FCPS's attempt to distinguish controlling First Amendment precedent fails.............. 17

    D.   FCPS's Virginia free exercise arguments fail.................................................... 18

III.  The remaining factors favor a preliminary injunction. ........................................... 19

IV.  Plaintiff does not seek a mandatory injunction....................................................... 19

Conclusion ........................................................................................................................ 20

Certificate of Service ....................................................................................................... 22

**Cases**

*Bufkin v. Collins*,
  604 U.S. 369 (2025) ............................................................................................. 12, 14

*CACI, Inc.-Fed v. U.S. Navy*,
  647 F. Supp. 3d 257 (E.D. Va. 2023) ............................................................................. 20

*Cath. Charities Bureau v. Wis. Lab. & Indus. Rev. Comm'n*,
  605 U.S. 238 (2025) .................................................................................................. 17

*City of Huntington Beach v. Newsom*,
   2026 WL 1785110 (June 18, 2026) ............................................................................... 9

*Clapper v. Amnesty International USA*,
  568 U.S. 398 (2012) .................................................................................................... 8

*Diamond Alt. Energy, LLC v. EPA*,
  606 U.S. 100 (2025) ................................................................................................. 2, 8

*Doe v. Pine Richland School District*,
  2026 WL 1103489 (3d Cir. Apr. 23, 2026) ................................................................. 8, 9

*E.K. v. Dep't of Def. Educ. Activity*,
  807 F. Supp. 3d 517 (E.D. Va. 2025) ............................................................................. 20

*East West, LLC v. Rahman*,
  873 F. Supp. 2d 721 (E.D. Va. 2012) ....................................................................... 17, 19

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) .................................................................................................... 8

*Fernandez v. RentGrow, Inc.*,
  116 F.4th 288 (4th Cir. 2024) ....................................................................................... 5

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ...................................................................................... 2

*Hughes Tool Co. v. Trans World Airlines*,
  409 U.S. 363 (1973) .................................................................................................... 8

*Kingdomware Tech., Inc. v. United States*,
  579 U.S. 162 (2016) ................................................................................................... 15

*Lujan v. Defs. of Wildlife*,

504 U.S. 555 (1992) ........................................................................... 2

*LWV of N.C. v. North Carolina*,

769 F.3d 224 (4th Cir. 2014) .......................................................... 20

*Mahmoud v. Taylor*,

606 U.S. 522 (2025)......................................................... 16, 17, 18, 19

*Miller v. Brown*,

462 F.3d 312 (4th Cir. 2006) .......................................................... 10

*Mirabelli v. Bonta*,

2026 WL 44874 (9th Cir. Jan. 5, 2026) ........................................... 6

*Mirabelli v. Bonta*,

607 U.S. 492 (2026)................................................................. passim

*Mountain Valley Pipeline, LLC v. 6.56 Acres*,

915 F.3d 197 (4th Cir. 2019) .......................................................... 20

*Murthy v. Missouri*,

603 U.S. 43 (2024).............................................................................. 2

*Parents 1 v. Montgomery Cnty. Bd. of Educ.*,

78 F.4th 622 (4th Cir. 2023) ............................................................. 7

*Parents Protecting Our Children, UA v. Eau Claire Area Sch. Dist.*,

95 F.4th 501 (7th Cir. 2024) ............................................................. 7

*Shapiro v. McManus*,

577 U.S. 39 (2015).................................................................... 12, 13

*Short v. Hartman*,

87 F.4th 593 (4th Cir. 2023) .......................................................... 6, 7

*Susan B. Anthony List v. Driehaus*,

573 U.S. 149 (2014)..................................................................... 8, 11

*TransUnion LLC v. Ramirez*,

594 U.S. 413 (2021)............................................................................ 5

*Trump v. Boyle*,

145 S. Ct. 2653 (2025)....................................................................... 2

*Trump v. CASA, Inc.*,

    606 U.S. 831 (2025) ........................................................................................................ 19

*Vlaming v. W. Point Sch. Bd.*,

    302 Va. 504 (2023) .................................................................................................. 18, 19

*W. Va. Rivers Coal., Inc. v. Chemours Co. FC*,

    178 F.4th 102 (4th Cir. 2026) ........................................................................................ 2

*Wudi Indus. (Shanghai) Co. v. Wong*,

    70 F.4th 183 (4th Cir. 2023) ....................................................................................... 20

**INTRODUCTION**

Only by disregarding the plain text of Regulation 2603 and asking this Court to flout the Supreme Court does FCPS argue Plaintiff is not entitled to a preliminary injunction. FCPS argues that Plaintiff lacks standing and her claims fail on the merits because Regulation 2603 is not an exclusion policy, as it does not authorize staff to conceal information from parents or facilitate student gender transitions over their objections. That is false. Regulation 2603 lists several actions schools "shall" take to facilitate students' social transitions, from calling them by their chosen names and pronouns, to allowing them to use restrooms, locker rooms, and overnight accommodations and assigning them to classes and activities according to their gender identity. It provides no exception—not when parents have withheld consent, and not when parents voice their objections. And it provides no mechanism that requires schools to notify parents before taking these actions.

Plaintiff does not want Regulation 2603 to apply to her or her children. She wants to raise her children in accordance with her sincere religious belief that sex is immutable and unchanging, and she wants to be the one making fundamental decisions about her children's mental health. Under the Supreme Court's precedent, as an "objec[t] of" Regulation 2603, she "very likely ha[s] standing" to challenge it. *Mirabelli v. Bonta*, 607 U.S. 492, 498 (2026) (per curiam). Under the free exercise and due process clauses, Plaintiff has the right not to have FCPS's "facilitation of [her] child's gender transition" and the "right not to be shut out of participation in decisions regarding [her] children's mental health." *Mirabelli*, 607 U.S. at 496-97. The Court should grant Plaintiff's motion for a preliminary injunction.

1

**ARGUMENT**

**I.     Plaintiff's motion is justiciable.**

**A.  Plaintiff likely has standing.**

"At the preliminary injunction stage, a plaintiff must show 'a substantial likelihood that it has standing.'" *W. Va. Rivers Coal., Inc. v. Chemours Co. FC*, 178 F.4th 102, 110 (4th Cir. 2026) (cleaned up). This is because in the context of the preliminary injunction factors, "the 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction," including "standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015); *see also Murthy v. Missouri*, 603 U.S. 43, 58 (2024). That standard is the same one applied in *Mirabelli*, and just like the parent classes in *Mirabelli*, Plaintiff likely has standing. Where a plaintiff "is 'an object of the action (or foregone action) at issue,' then 'there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'" *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992)). Because Plaintiff is "an object of" Regulation 2603, she has standing to challenge it. *Id*.

**1.** FCPS tries to distinguish *Mirabelli*, but its arguments fail. FCPS argues that *Mirabelli* was just "a *per curiam* opinion decided on the Supreme Court's emergency docket." PI Resp. 14. But *Mirabelli* applied the same standard that applies here and it "inform[s] how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025).

FCPS claims that *Mirabelli* is not on point because the policy at issue in that case was different. But the policies are materially similar in all respects relevant to this case. In *Mirabelli*, parents challenged California public school policies that "facilitate[d] a degree of gender transitioning during school hours" without parents' consent, including by using "children's preferred names and pronouns regardless of their parents' wishes." 607 U.S. at 493, 497.

2

Regulation 2603 does the same thing. Under Regulation 2603, schools "should" call "gender-expansive and transgender students" by their "chosen names and pronouns," regardless of the name in their permanent pupil record. Ex. H. at 3. They "shall" provide students access to locker rooms, restrooms, and may assign overnight accommodations according to gender identity, and "[i]n no case" can schools require gender-expansive and transgender students to use single-occupancy facilities or accommodations that conflict with their gender identity. *Id*. at 4-5. For other clubs, activities, sports, and gender-specific courses, students "shall" be allowed to participate according to their gender identity. *Id*. at 5. For "yearbooks and communications to outside media," schools "should" use students' chosen names and pronouns. *Id*. at 4. Just like the policy at issue in *Mirabelli*, Regulation 2603 lays out steps FCPS schools "shall" take to facilitate students' transitions during school hours, and there is no parental consent requirement or exception when facilitation is against the "parents' wishes." 607 U.S. at 493. Just like *Mirabelli*, Regulation 2603 is likely unconstitutional. *See* PI Memo. 14-17, 20-21.

FCPS objects, arguing that *Mirabelli* is distinguishable because Regulation 2603 "does not direct schools to withhold information from parents." PI Resp. 16. But that argument focuses on a distinction without a difference. FCPS cherry-picks the few ways Regulation 2603 differs from California's policy while ignoring the feature that made the policy constitutionally problematic: that schools facilitated students' gender transitions over the objection of parents. To be sure, the California policy went further in one respect—it expressly instructed teachers "not to tell parents about their children's gender identity without the children's consent." *Mirabelli*, 607 U.S. at 494. But Regulation 2603 need not replicate that precise language to raise the same concerns. Although Regulation 2603 no longer expressly directs schools to conceal information from parents, it likewise does not require schools to inform parents or obtain their consent before facilitating a

3

student's transition. *Compare* Ex. H *with* Ex. G at 1. The problem in *Mirabelli* was not only that the school district affirmatively hid things from parents, but that it "exclu[ded]" them from making decisions and "facilitate[d] a degree of gender transitioning" without their consent. 607 U.S. at 496-97. Regulation 2603 is an exclusion policy because it does those things too.

To begin, Regulation 2603 only contemplates parental involvement if a parent or student requests it. Under the regulation, schools can "convene a support team" to develop a "support plan," but only if a "student or parent … request[s]" one. Ex. H at 2. If students do not want their parents involved, they can simply decline to request a support team and not tell their parents they are experiencing gender confusion, and their parents would have no reason to suspect that requesting a support team was necessary. *See* PI Memo. 8-9, 15-16. And as explained, even without the support team, the regulation still requires teachers to facilitate transitions by calling students by their chosen names and pronouns, among other things. *See infra* II.A.1.

FCPS claims that Regulation 2603 "*affirmatively requires* parent participation on the student support plan teams." PI Resp. 16. But that purported safeguard does not fix the problem. The regulation does not require that a support team be convened in the first instance or that schools obtain parental consent before teachers are required to facilitate student transitions. *See infra* II.A. More importantly, even under Defendants' reading of the regulation, Plaintiff is subject to a policy that requires her participation in a support team if she wants to exercise any sort of control over her child's mental health in this area. As Plaintiff explained, she believes sex is binary and impossible to change, and she does not believe her children can be "'gender-expansive' or 'transgender.'" Lundquist-Arora Decl. ¶¶5, 7. Thus, she does "not want to participate in a 'gender-expansive and transgender' student 'support team' for [her] children" because participating in such a team would go against her religious beliefs. *Id*. ¶17. And regardless, the regulation still gives

parents no meaningful control—even if a support team is convened and parents are a part of it—because it makes them just one person on a multimember team with no authority to overrule the rest of the group. Ex. H at 2.

Just as the policies in *Mirabelli* "exclu[ded]" parents from the decision to "facilitat[e] a child's transition," 607 U.S. 496-98, Regulation 2603 excludes parents from the decision to facilitate their children's transitions. Put simply, Regulation 2603 is an "exclusion polic[y]" and Plaintiff is an "objec[t] of" it. *Id.* at 498. *Contra* PI Resp. 16.

**2.** FCPS next argues that Plaintiff's allegations are insufficient because they are not identical to those of the class representatives in *Mirabelli*. That argument misses the point. Although the named plaintiffs in *Mirabelli* had children who expressed gender incongruence at school and the schools took actions to assist the children's transitions without telling the plaintiffs, *Mirabelli*, 607 U.S. at 493-94, those individualized facts did not define the certified class. The district court instead certified a class encompassing all parents "who object to the challenged policies" and all parents "who seek a religious exemption." *Id.* at 494-95. Plaintiff falls within that class definition, which is all that matters.

"'Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Unlike "the early stages of a class action" where the court may "analyz[e] standing" based on only the "named plaintiffs," at the permanent injunction "stage of the litigation" following "summary judgment," "every class member must have Article III standing." *Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 295 (4th Cir. 2024) (cleaned up). So it was not just the class representatives, but all parents who "object to" or "seek a religious exemption" from California's policy that had standing. 607 U.S. at

5

495. This is why *Mirabelli* found *all* "the parents protected by the injunction," to "very likely have standing," not just the class representatives. *Id*. at 498.

The Ninth Circuit made the same mistake in *Mirabelli* that FCPS makes, and the Supreme Court rejected it. The panel there had "serious concerns" about the district court's injunction covering so many parents "due to lack of standing." *Mirabelli v. Bonta*, 2026 WL 44874, at \*2 (9th Cir. Jan. 5, 2026). Pointing to circuit court cases like the ones FCPS cites finding lack of standing for parents who "did not allege that their own child had gender support plans," the panel suggested that the district court's injunction granted relief to uninjured class members. *Id*. The Supreme Court disagreed. It held that "the parents protected by the injunction"—not only the class representatives—"very likely have standing because they are objects of the challenged exclusion policies." 607 U.S. at 498. Just like those class members, Plaintiff "object[s]" to Regulation 2603 and she "seeks a religious exemption" from it. *Id*. at 495. And just like the class members, as an "objec[t] of" Regulation 2603, she very likely has standing to challenge it. *Id*. at 498.

**3.** Defendants next argue that the Court should disregard *Mirabelli* in favor of circuit-court cases that predate it. Circuit precedent "'is not binding if it subsequently proves untenable considering Supreme Court decisions.'" *Short v. Hartman*, 87 F.4th 593, 605 (4th Cir. 2023). While the Court should not "lightly presume" that circuit precedent has been overturned, the Court must follow the Supreme Court where circuit precedent is "'impossible to reconcile'" with an intervening Supreme Court case. *Id*. That "high bar has been met" here. *Id*.

The Fourth Circuit in *Parents 1* said parents did not have standing to challenge the school district's parental preclusion policy because they had "not alleged any of their children have gender support plans" or that their children "had any discussions with school officials about gender-identity or gender-transition issues," and they had not alleged "that they suspect their children

6

might be considering gender transition or have a heightened risk of doing so." *Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 629-30 (4th Cir. 2023).[1] Even though the parents had students who attended the schools and who the policy applied to, and they objected to the policy on due process grounds, the Fourth Circuit found that they lacked standing. *Id*. at 627, 629. Defendants also point to a Seventh Circuit case, *Parents Protecting*, which similarly found standing lacking for parents of students who went to schools under the policy, even though parents "harbor[ed] genuine concerns about possible applications of the School District's policy," and challenged it under the Free Exercise and Due Process Clauses. *Parents Protecting Our Children, UA v. Eau Claire Area Sch. Dist.*, 95 F.4th 501, 503 (7th Cir. 2024).

FCPS makes no effort to explain how these decisions comport with *Mirabelli*. As explained, *supra* I.A.2, the parent classes in *Mirabelli* did not include only those with children who had gender support plans or a heightened risk of considering transitions. 607 U.S. at 494-95. Instead, it was enough for standing that the parents were "objects of the challenged exclusion policies" and "object[ed] to the challenged policies or s[ought] religious exemptions." *Id*. at 498. The same is true of Plaintiff.

Rather than explain why those circuit court decisions are reconcilable with *Mirabelli*'s determination that the parent classes there "very likely have standing," *id*., FCPS says *Mirabelli* wouldn't have "sub silentio" overturned binding precedent. PI Resp. 17. But *Mirabelli* didn't do anything sub silentio. It directly ruled on standing in that case, and to the extent that it conflicts with the lower court cases Defendants point to, it controls. *Hartman*, 87 F.4th at 605. FCPS's

---

[1] In addition, the Court in *Parents 1* specifically relied on the fact that those plaintiffs only challenged the school's policy of withholding information from parents, not "the Guidelines as a whole." 78 F.4th at 628, 631-32. Plaintiff challenges all of Regulation 2603, including its facilitation of gender transitions without parental approval.

assertion that the Court should assume anything from the fact that the Supreme Court denied certiorari in those circuit cases, PI Resp. 18, is an invitation to err, *see, e.g.*, *Hughes Tool Co. v. Trans World Airlines*, 409 U.S. 363, 365 n.1 (1973) ("[D]enial of certiorari imparts no implication or inference concerning the Court's view of the merits."). And *Mirabelli* didn't overrule *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), or *Clapper v. Amnesty International USA*, 568 U.S. 398 (2012), at all—"sub silentio" or otherwise.

In *SBA List* and *Clapper*, the Supreme Court clarified that a threatened injury is sufficient for standing if it is "'certainly impending' or there is a 'substantial risk' that the harm will occur." 573 U.S. at 158. The *Clapper* plaintiffs were not the objects of the surveillance statute they sought to invalidate. 568 U.S. at 406. Instead, they feared that "some of the people with whom they exchange foreign intelligence information" might be subjects of it, and so they could incidentally be surveilled if those people were targeted under the statute. *Id*. at 407. As the Supreme Court explained, that argument rested on a "speculative chain of possibilities." *Id*. at 414. This case is different. Unlike in *Clapper*, it is Plaintiff—not some third party—who is regulated by Regulation 2603. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382-83 (2024) (explaining this distinction). Plaintiff is currently an object of the regulation that excludes her from being the one to make decisions for her children. *See Mirabelli*, 607 U.S. at 498; *Diamond*, 606 U.S. at 112.

*Mirabelli*'s holding is why courts that have addressed standing in parental exclusion cases since the Supreme Court's decision have unanimously agreed with Plaintiff's view. In *Doe v. Pine Richland School District*, the Third Circuit held that a parent had standing to pursue damages because she "was an object of the challenged policy while her child was enrolled in the district." 2026 WL 1103489, at *1 (3d Cir. Apr. 23, 2026). In *City of Huntington Beach v. Newsom*, the Ninth Circuit said, "an objecting parent who is the target of [the challenged policy's] effort to

8

prohibit constitutionally required mandatory policies has standing to seek injunctive relief." 2026 WL 1785110, at *3 (June 18, 2026). FCPS's attempts to distinguish *Doe* and *City of Huntington Beach* are based on its same flawed reading of *Mirabelli* itself. *See supra* I.A.1. First, the policy in *Doe*, like *Mirabelli*, is like Regulation 2603 in every relevant way: it required schools to "create the conditions supporting a safe and accepting environment" for a student's transition without first obtaining parents' consent. 2026 WL 1103489, at *1. Second, that the policy in *City of Huntington Beach* only concerned affirmatively withholding information from parents doesn't change its understanding of *Mirabelli*. 2026 WL 1785110, at *3 (explaining all that matters is that parents "are the 'objects' of" the challenged policy). Moreover, the differences between Regulation 2603 and those policies might go to the merits, but not to Plaintiffs' standing to challenge them. As both cases confirm, under *Mirabelli*, what matters is that the parents are the "objects" of the challenged policy, not the particulars of what the policy requires. *Id*. at *3, *Doe*, 2026 WL 1103489, at *3.

**4.** FCPS next points to Plaintiff's and her sons' earlier statements to argue that she lacks standing. But only under *Parents 1*'s pre-*Mirabelli* view of standing would those statements be relevant. All that is required under *Mirabelli* is that Plaintiff is the "objec[t]" of the challenged policy. 607 U.S. at 498. It does not matter whether Plaintiff's children are particularly likely to ever experience gender confusion. *Id*. And this case perfectly illustrates why. Plaintiff's children made those declarations over a year ago. Docs. 18-2, 18-3, 18-4. Issues of gender dysphoria are incredibly fluid. *E.g.*, Ex. C. at 3879 (noting that 85% of children with a childhood gender dysphoria diagnosis do not remain gender dysphoric). Children grow and change and are influenced by new friends, teachers, and media. What a child believes about himself one month or year may not be what he believes the next. As *Mirabelli* explains, subjecting parents to a policy that makes schools the decision-makers if their children express gender confusion violates parents'

fundamental rights. 607 U.S. at 496-97. Plaintiff fears that her children could grow and change, and that they could "at some point during adolescence be susceptible to the influence of gender ideology." Lundquist-Arora Decl. ¶8. And she knows that if they do change, Plaintiff may not even be aware before the school begins facilitating their transitions. *Id*. ¶14. Rather than tell her, FCPS will override her wishes and facilitate transitions by, among other things, calling her children by names and pronouns that do not correspond with their sex. Ex. H. at 3. *Mirabelli* makes clear that she has standing to challenge Regulation 2603 now. 607 U.S. at 498.

### B. Plaintiff's claims are ripe.

FCPS claims Plaintiff's complaint is not ripe because "Regulation 2603.3 has not yet been applied to students, and FCPS is still training staff on implementation" and "working on a new guidance document to guide staff." PI Resp. 19. FCPS claims that it is too early to know how Regulation 2603.3 will work in practice, but it does not explain what might change. *Id*. FCPS agrees that Regulation 2603.3 is in effect. PI Resp. 10. It states that teachers and staff will be trained on the Regulation before the start of the school year, which is August 24, 2026. Presumably by the time the Court hears argument on this motion, that training will have taken place. *Id*. And FCPS does not dispute that Regulation 2603 currently applies to and will be enforced against school families once school begins. *Id*. Finally, as Plaintiff explains, the Regulation's plain text requires facilitation of transitions without parental approval, *infra* II.A, and any future guidance document will not change that fact. That is all that is necessary for ripeness. *See Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) ("A case is fit for judicial review when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties.").

FCPS next recycles their standing arguments to say that Plaintiff faces no "immediate hardship." It claims that because Plaintiff "does not have a child who is transgender or gender-

expansive, or even questioning his gender identity," Plaintiff's claim is not ripe until she does. PI Resp. 19. But as explained, because Plaintiff is an "objec[t]" of Regulation 2603 now, her claim is ripe. *Supra* I.A.1. Plaintiff also meets the prudential ripeness factors.[2] Plaintiff's challenge is to the application of Regulation 2603's plain text, so it "presents an issue that is 'purely legal, and will not be clarified by further factual development." *See SBA List*, 573 U.S. at 167-68. And "denying prompt judicial review would impose substantial hardship" by forcing Plaintiff to choose between subjecting herself and her children to a policy that violates her beliefs and removing them from FCPS schools. *Id*. Far from an "abstract disagreement," PI Resp. 20, Plaintiff challenges FCPS's application of an unconstitutional policy to her and her children.

## II. Plaintiff is likely to succeed on the merits of each claim.

On the merits, FCPS largely agrees with Plaintiff's description of the law. Rather than contest the applicable legal principles, FCPS argues that Plaintiff's claims "res[t] on a false premise," based on FCPS's erroneous reading of the regulation. PI Resp. 20. That argument fails.

### A. FCPS misreads the Regulation.

FCPS argues that Plaintiff fails on the merits because her claims are premised on a "misreading of Regulation 2603.3." The opposite is true. It is FCPS that misreads the regulation. Regulation 2603 does not condition FCPS staff's obligations on parental knowledge or consent; instead, it requires staff to take affirmative steps to facilitate student transitions regardless of whether parents know or agree with those steps. *See* PI Memo. 14-17.

---

[2] FCPS describes the "'prudential ripeness' factors," which the Supreme Court cast doubt on in *SBA List*, 573 U.S. at 167 (explaining that "prudential" nonjusticiability is "in some tension with … the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging" (cleaned up)). Regardless, Plaintiff succeeds on both factors.

**1.** Begin with FCPS's assertion that "accommodations are provided on an individual basis and only upon request," and so "only when students *and their parents* 'opt in.'" PI Resp. 22-23 (emphasis added). That is not what Regulation 2603 says. FCPS's argument attempts to add a parental-consent requirement that appears nowhere in the regulation's text. Parts V-X of the regulation use mandatory language to prescribe the actions school staff must take to facilitate student transitions. "It is undisputed that the word 'shall' imposes a mandatory command." *Bufkin v. Collins*, 604 U.S. 369, 379 (2025). The regulation provides that schools "shall" allow students to use locker rooms, restrooms, and may assign overnight accommodations consistent with their gender identity, and "[i]n no case" can they require students to use single-person accommodations or accommodations that conflict with their gender identity. Ex. H at 4-5. Likewise, schools "shall" allow students to participate in sports, activities, and classes according to their gender identity. *Id*. Schools "should" call students by their chosen names and pronouns, and "should" use students' chosen names and gender markers in yearbooks and communications to outside media. *Id*. at 3-4. Contrary to FCPS's repeated assertions that Regulation 2603 "does not direct staff to provide accommodations over the parent's objection," PI Resp. 23; *see also id*. at 6, the regulation contains no such limitation. Regulation 2603 "admits of no exception," and its "mandatory 'shall'" provisions "creat[e] obligations impervious to … discretion." *Shapiro v. McManus*, 577 U.S. 39, 43 (2015). Nowhere does Regulation 2603 state that these obligations apply only after parents opt in, or that school staff are relieved of them when parents object.

Defendants point to a line describing the student support teams, which states that "[a]ny accommodations for access to gender-specific facilities, overnight trips or events, gender-specific courses, activities, or athletics, and name or gender-marker changes to non-permanent scholastic records must be documented in a support plan." Ex. H at 2. But that does not solve the problem.

First and most obviously, that line says nothing about the use of students' chosen names and pronouns by teachers and staff, and nothing about the use of those names and pronouns in yearbooks and communications with outside media. The regulation provides that staff "should" call students by their chosen names and pronouns and use those names in "school documents such as yearbooks and communications to outside media." *Id*. at 3-4. Thus, even if Part IV were somehow read to limit the actions staff must take regarding bathrooms, locker rooms, classes, and activities, the regulation independently directs schools to facilitate students' transitions through the use of chosen names and pronouns. *Id*. FCPS effectively concedes this point, agreeing that Regulation 2603 "does not require a documented gender support plan for a student to request that staff refer to them by a chosen name or pronoun." PI Resp. 23-24. FCPS's only response is to assert, without citation, that "nothing in the Regulation directs staff to use students' chosen names or pronouns over their parents' objections." *Id*. at 24. But that assertion is inconsistent with the regulation's text. The regulation states that "students should be called by their chosen names and pronouns by staff, regardless of the name and gender recorded in the students' permanent pupil record." Ex. H at 3. It contains no exception for situations in which parents object. *Shapiro*, 577 U.S. at 43. Indeed, FCPS practically concedes this. Its only reliance is on a provision stating that schools shall make "every effort" to "encourage and support communication between gender-expansive or transgender students and the student's parents." PI Resp. 23 (citing Ex. H at 3). But encouraging communication is not the same as requiring parental consent, nor does it give parents the ability to prevent staff from following the regulation's directive. Accordingly, even if the Court were to accept FCPS's interpretation of Part IV.B as giving parents a say in their children's access to facilities, activities, and classes, the Court must still recognize that the Regulation 2603 directs

schools to use students' chosen names and pronouns without requiring parental consent or providing an opportunity to opt out. Ex. H at 2-3.

Second, FCPS's argument (at 23) that support plans are required before staff may provide "accommodations" to facilitate student transitions—and that "[a]ll the latter provisions in the regulation" are just examples of accommodations a support plan might include—is contradicted by the regulation's text. As explained above, Parts V-X impose affirmative obligations using mandatory language such as "shall" and "should." Ex. H at 3-5; *see Bufkin*, 604 U.S. at 379. Those provisions do not suggest that staff might have the discretion to implement some transition-related measures but not others, nor do they state that staff's obligations arise only if a student support plan includes them. FCPS's interpretation also improperly collapses two distinct provisions of the regulation. Part IV.C expressly describes the types of accommodations that a support team "may include" in a support plan. Ex. H at 2-3. The regulation's use of discretionary language in Part IV.C—and mandatory language elsewhere—confirms that Parts V-X are not merely examples of optional support-plan accommodations.

Third, the provision FCPS identifies does not impose a requirement on school staff before they take the actions required by Parts V-X. It merely provides an instruction to the student support team: the "accommodations" mandated by the rest of the policy must be "documented in a support plan." Ex. H at 2. Parts V-X govern schools and their staff generally, setting forth the actions they are required to take to facilitate a student's transition. *Id*. at 3-5. Part IV, by contrast, creates and governs the student support team. *Id*. at 2-3. Under Part IV.B, the support team must "document" the "accommodations" in a "support plan." *Id*. But nothing in that provision states that the absence of a support plan or failure to document an accommodation relieves the staff of the obligations imposed by Parts V-X. *Id*. FCPS's interpretation improperly transforms a documentation

14

requirement into a prerequisite for the regulation's application. The regulation's broader structure forecloses that reading. Parts V-X use mandatory language, student support teams are not required in every case and are convened only when requested, and Part IV.B does not even identify every action addressed in Parts V-X. Reading Part IV.B as an "opt in" requirement would therefore add a limitation that the regulation does not contain.

**2.** Next, consider FCPS's assertion that Regulation 2603 "does not shut parents out" because it contemplates parental participation on student support teams. PI Resp. 24. That is wrong for at least three reasons. *See* PI Memo. 15-17. First, student support teams are not required. A "student or parent *may* request that the school convene a support team for a student who is gender-expansive or transgender." Ex. H at 2 (emphasis added). The word "may" denotes "discretion," not a requirement. *See Kingdomware Tech., Inc. v. United States*, 579 U.S. 162, 171 (2016). Thus, if a student never requests a support team, and the parent is unaware of the need for one, no support team would ever be convened. Ex. H at 2. FCPS's assertion that the regulation "does not authorize staff to hide information from parents" misses the point. PI Resp. 23. As FCPS does not dispute, the regulation does not contain any affirmative duty requiring staff to *notify* parents when a child is experiencing gender confusion or otherwise make them aware of the potential need for a support team. Without such a duty, parents have no mechanism to request a support team before the regulation's other provisions require staff to facilitate a student's transition. As explained above, the mandatory provisions in Parts V-X apply regardless of whether a support team exists. *Supra* II.A.1. Second, even when a support team is convened, the regulation does not give parents decision-making authority. Defendants do not dispute that the regulation contemplates parents as merely one participant on a "multidisciplinary team" that develops a support plan. Ex. H. at 2. It does not require the support team to adopt a parent's position or defer to "the parent's objection."

*Contra* PI Resp. 6, 23. A parent's participation provides no ability to override the decisions of the group when they conflict with the parent's deeply held religious beliefs. Finally, FCPS's proposed solution assumes that parents can participate in a process that requires them to affirm the very premise they object to. The regulation invites parents to join a "support team for a student who is gender-expansive or transgender" in order to exercise authority over that process. Ex. H at 2. But for parents whose religious beliefs reject the premise that a person could be gender-expansive or transgender, participation on such a team would require them to concede what they believe they cannot concede. Lundquist-Arora Decl. ¶¶7, 17; *see Mahmoud v. Taylor*, 606 U.S. 522, 552 (2025).

## B.  FCPS agrees with Plaintiff's legal arguments on the due process claims.

Outside of its attempt to rewrite Regulation 2603, FCPS appears to agree with Plaintiff's due process analysis. FCPS agrees that Plaintiff has "the right not to be shut out of participation in decisions regarding [her] children's mental health." PI Resp. 24 (quoting *Mirabelli*, 607 U.S. at 497). FCPS likewise agrees that Plaintiff's claim under Virginia's Due Process clause is governed by that same standard. *Id*. at 25.

FCPS's only arguments depend on a misreading of the regulation itself. PI Resp. 24-25. Without providing Plaintiff any ability to opt out or exercise control over these fundamental decisions concerning her children, Regulation 2603 requires schools to facilitate students' transitions by using their chosen names and pronouns, using those names and pronouns in yearbooks and external communications, and assigning them to locker rooms, restrooms, hotel rooms, classes, activities, and sports consistent with their gender identity. *Supra* II.A. These are fundamental decisions about Plaintiff's children's lives, and Plaintiff has the right to make them. Regulation 2603 prevents her from doing so. Plaintiff is therefore likely to succeed on the merits of her due process claims. *See Mirabelli*, 607 U.S. at 497.

**C. FCPS's attempt to distinguish controlling First Amendment precedent fails.**

FCPS argues that Plaintiff's First Amendment claim fails because Regulation 2603 is neutral and generally applicable and therefore is subject only to rational-basis review. PI Resp. 21-22. But that argument puts the cart before the horse. As in *Mirabelli* and *Mahmoud*, where policies imposed burdens on parents' religious exercise by interfering with their "sincere religious beliefs about sex and gender," Regulation 2603 "'impose[s] the kind of burden on religious exercise that *Yoder* found unacceptable.'" *Mirabelli*, 607 U.S. at 496 (cleaned up). Accordingly, this Court "need not ask whether" Regulation 2603 "is neutral or generally applicable before proceeding to strict scrutiny." *Mahmoud*, 606 U.S. at 564. FCPS does not attempt to satisfy strict scrutiny. *See East West, LLC v. Rahman*, 873 F. Supp. 2d 721, 728 (E.D. Va. 2012) (arguments not responded to are conceded). Because FCPS has not carried its burden, Plaintiff is likely to succeed on her free exercise claim. *Cath. Charities Bureau v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 254 (2025) (ruling for plaintiff where defendant "failed to carry its burden under strict scrutiny").

FCPS's argument that *Mahmoud* and *Mirabelli* don't control again rests on its incorrect reading of Regulation 2603. FCPS claims this case is different from *Mahmoud* because Regulation 2603 is an "opt in" policy. PI Resp. 23. But as explained above, *supra* II.A, it is not. The regulation does *not* provide transition-related accommodations "on an individual basis and only upon request." *Contra* PI Resp. 22. Rather, it requires school staff to take affirmative steps to facilitate students' transitions and provides parents with no mechanism to opt out or withhold consent. While some provisions—like the one governing internal school electronic systems—provide that the school should only use the names and gender identities "designated by the students *and parents*," Ex. H at 4 (emphasis added), each provision challenged here contains no such limitation. Instead, they require schools to follow the chosen names and gender identities designated by "students,"

without providing *parents* the right to "opt in," opt out, or otherwise control those decisions. *Contra* PI Resp. 23; *see* Ex. H at 3-5. This demonstrates that when FCPS intended to require parental involvement, it knew how to do so. It chose not to do it in the provisions challenged here. Thus, contrary to FCPS's assertion, *Mahmoud* is directly on point. 606 U.S. at 550.

FCPS's attempt to distinguish *Mirabelli* is even weaker. As FCPS acknowledges, PI Resp. 23, *Mirabelli* held that the "unconsented facilitation of a child's gender transition" is a significant "intrusion on parents' free exercise rights," 607 U.S. at 496. FCPS argues that Regulation 2603 is different because it "does not authorize staff to hide information from parents." PI Resp. 23. But that misses the point. *Mirabelli* turned on the "unconsented facilitation" of a child's gender transitions, not whether the policy expressly directed staff to conceal information from parents. 607 U.S. at 496. As explained above, Regulation 2603 requires schools to facilitate transitions— including by using students' chosen names and pronouns—without any exception for when parents do not consent. *Supra* II.A. *Mirabelli* therefore directly controls. 607 U.S. at 496.

### D. FCPS's Virginia free exercise arguments fail.

On the Virginia free exercise claim, FCPS does not dispute that Virginia, unlike the United States Supreme Court's interpretation of the federal free exercise clause, applies strict scrutiny to even neutral and generally applicable laws. *See* PI Resp. 26; *Vlaming v. W. Point Sch. Bd.*, 302 Va. 504, 538 (2023). FCPS instead attempts to distinguish *Vlaming* because Plaintiff alleges a "speculative future application." PI Resp. 26. But nothing in *Vlaming* turned on the fact that the case was brought *after* the government's unconstitutional action rather than to *prevent* unconstitutional action. *See Vlaming*, 302 Va. at 540 (describing a broad "constitutional duty of accommodation"). If anything, FCPS's citationless argument on this point goes to standing, not merits, and as explained, Plaintiff likely has standing. *Supra* I.A.

Under the Virginia Free Exercise Clause, FCPS has a "duty" to "accommodate" Plaintiff's "religious liberty" interest in raising her children in her beliefs about sex and gender unless it has a compelling interest that cannot be satisfied by less restrictive means. *Vlaming*, 302 Va. at 538, 540. FCPS does not dispute, and thus concedes, it cannot meet that burden. *See East West*, 873 F. Supp. 2d at 728. FCPS's Virginia free exercise arguments fail.

## III. The remaining factors favor a preliminary injunction.

FCPS does not dispute that if Plaintiff succeeds on the merits, she succeeds on the other injunction factors. FCPS's irreparable harm arguments instead repeat its standing arguments, claiming that any injury is too speculative. PI Resp. 26-27. Because Plaintiff shows likely success on the merits, she also shows the other injunction factors. *See* PI Memo. 24-25.

FCPS next argues that it would face too much hardship from an injunction because an order "enjoining Regulation 2603.3 would leave the school board with no policy for the treatment of transgender students." PI Resp. 28. Of course, Plaintiff has only requested—and can only obtain— an injunction for herself. *See Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025). But to the extent that FCPS fears that relief for Plaintiff would lead too many "other like-minded parents to also preemptively seek exemptions," PI Resp. 28, that is no reason not to grant an injunction for Plaintiff. FCPS "cannot escape its obligations" by crafting a policy "that is so burdensome that a substantial number of parents elect to opt out." *Mahmoud*, 606 U.S. at 567. Any such problem "is self-inflicted." *Id*.

## IV. Plaintiff does not seek a mandatory injunction.

FCPS argues that Plaintiff must meet a higher burden because Plaintiff seeks a "mandatory injunction." That is false. Plaintiff did not request that FCPS "create a separate set of processes for dealing with Lundquist-Arora and her children." PI Resp. 11. She simply asked that schools not

apply the regulation to her and her children. Plaintiff asked this Court to "preliminarily enjoin Defendants from enforcing Regulation 2603, and any materially similar policy, provision, or law that applies in the FCPS system against Plaintiff during this litigation." PI Mot. 1. As FCPS later concedes, this is a "prohibitory injunction." PI Resp. 28. With the injunction, Plaintiff seeks to "maintain" or "restor[e]" the status quo to the "'last uncontested status between the parties'" by not applying the newly effective Regulation 2603.3 to her. *LWV of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014); *see also E.K. v. Dep't of Def. Educ. Activity*, 807 F. Supp. 3d 517, 530 (E.D. Va. 2025) (explaining that an injunction to "restore the status quo to how it existed" before a policy took effect is a prohibitory injunction). "Without doubt, this is the language and stuff of a prohibitory injunction seeking to maintain the status quo." *LWV of N.C.*, 769 F.3d at 236; *see also Wudi Indus. (Shanghai) Co. v. Wong*, 70 F.4th 183, 191 (4th Cir. 2023) (describing an injunction as "mandatory" because it "requires [the party] 'to abide by an agreement'" and "prohibitory" because it "prohibits [the party] from engaging in a broad range of conduct"). Regardless, even if the Court construes this as a mandatory injunction, Plaintiff has established all four factors and is entitled to one. *See CACI, Inc.-Fed v. U.S. Navy*, 647 F. Supp. 3d 257, 263, 281 (E.D. Va. 2023) (granting "mandatory" injunction); *Mountain Valley Pipeline, LLC v. 6.56 Acres*, 915 F.3d 197, 216 n.8 (4th Cir. 2019) ("[W]here the applicant's right to relief is indisputably clear, … mandatory injunctive relief remains available." (cleaned up)).

**CONCLUSION**

For these reasons, this Court should preliminarily enjoin Defendants from enforcing FCPS Regulation 2603 against Plaintiff and her children.

Dated: July 31, 2026

Respectfully submitted,

Ian Prior*  
Crystal Clanton*  
Rachael Griffin**  
AMERICA FIRST LEGAL FOUNDATION  
611 Pennsylvania Ave. SE, Suite 231  
Washington, D.C. 20003  
(703) 999-0273  
ian.prior@aflegal.org  
crystal.clanton@aflegal.org  
rachael.griffin@aflegal.org

*/s/ Rachael Tucker Wyrick*  
Rachael Tucker Wyrick  
  (VA Bar No. 99763)  
Cody R. Milner*  
Marie E. Sayer**  
CONSOVOY MCCARTHY PLLC  
1600 Wilson Blvd., Suite 700  
Arlington, Virginia 22209  
(703) 243-9423  
rachael@consovoymccarthy.com  
cody@consovoymccarthy.com  
mari@consovoymccarthy.com

\* Admitted pro hac vice  
\*\* E.D. Va. bar applications pending

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2026, I served the foregoing document with the Clerk of

Court using the Court's ECF system, thereby serving all counsel who have appeared in this case.

DATED: July 31, 2026

*/s/ Rachael Tucker Wyrick*
Rachael Tucker Wyrick
  (VA Bar No. 99763)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, Virginia 22209
(703) 243-9423
rachael@consovoymccarthy.com